IMLAY and others *against* HUNTINGTON and others.

On the 6th of *June* 1826, an agreement by indenture was entered into between *A, B* and *C,* by which *A,* in consideration of an intended marriage between him and *B,* covenanted, that after the celebration of the marriage, he would pay over to *C,* in trust for *B,* subject to her sole controul, for her individual use and benefit, out of certain moneys which *B* expected to receive under the wills of her grand-father and aunt, the sum of 10,000 dollars ; and that *A,* after retaining for his individual use, as his own estate, the one half part of the residue of such moneys so to be received, would pay over the other half part of such residue to *C,* to be held by him in trust for *B,* for twenty years from the day when the marriage should be solemnized ; after which period, *C* should no longer possess or controul the same, but should convey it to such person or persons as *B* should appoint ; and that upon the decease of *B,* the

amount in the hands of her trustee should descend to her heirs at law, unless she should, by her will, otherwise order and appoint. On the 12th of *June* 1826, *A* was legally married to *B;* and within six months afterwards, he received under said wills about 60,000 dollars ; the whole of which he was permitted to use and manage, as fully as if no such marriage agreement had ever been made, with the knowledge of *B* and *C,* and without objection on their part. On the 16th of *April* 1846, *B* died, intestate, leaving three brothers and a niece her only heirs at law. On a bill in chancery, brought by these heirs against *A,* to obtain from him the payment of such sums as they were entitled to receive, by virtue of said indenture, the defendant claimed, that *B* abandoned said articles of agreement, and relinquished to him the whole of the moneys so received by him and her separate estate therein, not by any instrument in writing, but by her repeated declarations, and the acts and conduct of herself and her trustee. It was proved, that *B* declared to her friends, that she had not a dollar independently of her husband ; that whatever was her property was her husband's, and whatever was her husband's was hers ; that the income settled upon her as her own, was all done away with, and they had no separate interests. There was other evidence, consisting of a great variety of conduct on the part of *A* and *B,* as well as of *C,* the trustee, in relation to the management, expenditure, appropriation and investment of the fund, shewing that from the time when the moneys were received by *A,* the original design of him and his wife of placing them in the hands of the trustee for her separate use, was entirely relinquished, and that it was her intention to abandon any separate interest in the property, and to give it absolutely to her husband ; and that it was ever afterwards, with her full knowledge, approbation and authority, treated in every respect by him, as if it were absolutely his own ; and all this, without the slightest evidence to shew that she was induced thus to do, by any fraud, compulsion, undue influence or improper act on his part, but with clear proof that she was prompted to this course, by an affection, heightened by his uniform and most devoted attention to her feelings and wishes, and his incessant efforts to promote her comfort and happiness. Held,

1. That the ante-nuptial agreement was, in its character, merely *executory,* resting in covenant alone, and remained thus executory until the moneys should be paid over to the trustee according to the agreement :

2. That before the agreement was thus executed, it was competent for *B* to discharge her husband from the further fulfillment thereof, and to abandon the trust ; there being no terms or stipulations in the agreement restraining her from so doing :

3. That the clause in the agreement providing that upon her decease, the amount in the hands of the trustee should descend to her heirs, unless she should, by her will otherwise order and appoint, constituted no restriction of her power of disposition, which these heirs could avail themselves of, as against *A* claiming under her :

4. That if, as against such heirs, it was competent for her to abandon the agreement and relinquish the trust therein provided for, and she has done so, the effect of such abandonment and relinquishment will be to destroy her separate estate in the moneys in question and vest the property in her husband ; and consequently, the heirs, as such and independently of the agreement, can have no claim :

5. That to prove such abandonment and relinquishment, no written instrument

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

is requisite, but the proof may be of any character, legally admissible, which satisfies the mind :

6. That the evidence given in this case, of the declarations of *B,* and of the conduct of the parties, was sufficient :

7. That if it be conceded, as claimed by the heirs, that they are, by the terms of the agreement, to be deemed, not merely volunteers, but purchasers, for a valuable consideration, of the property in question ; and that, as against them, it was not competent for *B* to discharge the execution of the agreement and abandon the trust ; and that therefore *A,* by the reception of the moneys, became, in equity, a trustee thereof, in the same manner, and on the same terms, and to the same extent, as stipulated in the agreement; still *B,* by the terms of the agreement, retained the right of disposing of the moneys to her husband :

8. That the rule of construction is widely different between conveyances wherein it is the object of the grantor to convey his property, and to retain a future power in himself of disposing of it, but to restrict himself in the exercise of that power to a particular mode, and conveyances wherein it is his object to place the property entirely beyond his own controul, but to confer on a third person the power of changing the disposition of it—in the former case, the restraining words or phrases ought to receive such a construction as is most favourable to the owner; whereas, in the latter case, they should be taken in their most efficacious sense, and expounded, with respect to the donee, according to their most enlarged and operative import :

9. That the ante-nuptial agreement, construed under this rule, did not impair the *jus disponendi* of *B,* in relation to these moneys, which is generally incident to the ownership of property :

10. That the provision in the agreement regarding the ultimate disposition of the amount in the hands of the trustee, after the expiration of twenty years from the solemnization of the marriage, was to be construed as a covenant to convey the property to whomsoever *B* should, *at any time*—whether before or after the expiration of that period—designate :

11. That an ante-nuptial settlement, by a woman, of her property, to her separate use after marriage, gives her, in equity, the full power of disposing of that property, by any suitable act or mode of conveyance, in the same manner, and to the same extent, as if she were a feme sole, except so far as there is some restriction, express or implied, upon such power of disposition, in the instrument of settlement; and that no such restriction is implied from the circumstance that it is provided in the settlement, that she may dispose of it in any particular mode therein pointed out ; but that, in order to constitute such a restriction, the provision must either expressly or by necessary implication, exclude any other mode of disposition :

12. That where her property is so settled for her separate use, through the medium of a trust created for that purpose, she may exercise such power of disposition, even without the assent of her trustee, unless such assent is made necessary, by the terms of the instrument :

13. That in this case, such assent, if necessary, is fully shewn by the acts of the trustee :

14. That by the established rules of construction applicable to this case, none of the provisions in the agreement operated to prevent *B,* at any time, from disposing of the principal and interest of the first fund, or of the income and reversion of the other; and that they being limited to her separate use, she had the full power of a feme sole in regard to their disposition.

THIS was a bill in chancery, brought by *William E. Imlay* and *Lucretia W. Imlay*, his wife, and *William Morgan*, against *Hezekiah Huntington*, making also *James Morgan* and *John Morgan* parties defendants; praying for a discovery and the specific execution of an agreement by indenture, particulary set forth, as nearly as it could be done.

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

The bill averred, that said *Huntington*, in the year 1827, received, in right of *Sarah*, then his wife, under the will of her grand-father, *James Morgan*, deceased, the sum of 37,000 dollars, in money and stocks, and under the will of her aunt, *Mary Morgan*, the sum of 23,000 dollars; and that said *Huntington* received said sums to be held and disposed of according to the true intent and meaning of said indenture; and that thereby a large sum, *viz.* 25,000 dollars, part and parcel of said sums so received by said *Huntington*, became his absolute property and estate; and the residue of said sums so received by said *Huntington*, *viz.* the sum of 35,000 dollars, was, by said indenture, placed in the hands and under the controul of said *James Morgan* and *John Morgan*, as a trust fund, for the use and benefit of said *Sarah*, and her heirs at law, according to the agreements and covenants contained in said indenture. The bill also stated the death of said *Sarah*, on the 16th day of *April* 1846, leaving her brothers, said *James Morgan*, *William Morgan* and *John Morgan*, and her niece, said *Lucretia W. Imlay*, her only heirs at law, and entitled to said trust fund, according to the terms and true intent of said indenture.

The defendant *Huntington*, in his answer, denied, that 35,000 dollars of said moneys, or any other sum, was, by said indenture, placed in the hands, or under the controul, of said trustees, as stated in the plaintiffs' bill. He also denied that he received or held said moneys, as agent for said trustees, or in their behalf, or upon any trust or confidence between himself and them. This defendant then alleged, that neither said *Sarah*, nor said trustees, or either of them, nor any person in their behalf, ever made any demand of him to pay over said moneys, or any part thereof, to said trustees, according to the tenor of said indenture, or in any manner, although said *Sarah* was present when said moneys were paid to him, or was apprised that they were so paid, very soon

Hartford,
August, 1849.

Imlay
v.
Huntington.

after the payment was made; and said trustees were also apprised of such payment, very soon after it was made. This defendant further alleged, that after the execution of said indenture, and without any steps having been taken to carry its provisions into effect, all the parties thereto—as well said *Sarah* as said trustees—forever abandoned said articles and all intention of carrying them into effect; and that said trustees relinquished said moneys to this defendant; and that after they were so relinquished, said *Sarah*, with the acquiescence of the said trustees, did proceed to exercise the absolute controul and right of property over said moneys, which by the said articles she was empowered to exercise; and did relinquish to this defendant the whole of said moneys, and renounced her sole and separate estate therein, and allowed this defendant to dispose of the same, as fully and absolutely as if no such articles had ever been executed.

And this defendant further alleged, that the said articles, being so abandoned, and said moneys being so relinquished, to him, he hath ever, and during a period of twenty years, or about that period, previous to the death of said *Sarah*, exercised the absolute controul, enjoyment and disposition of the said moneys, in as full and ample a manner as if said articles had never been executed, and that with the full knowledge and acquiescence of said *Sarah*, and of said trustees.

The answer then averred, that the whole of the property, which, by said articles, he agreed to convey to the separate use of said *Sarah*, had been long since expended for her advantage, and according to her express request and desire, and with full knowledge and acquiescence, on the part of said trustees, during the whole period which has intervened since the said property came to the hands of this defendant.

On a hearing, on bill and answer, before the superior court in *Hartford* county, *May* adjourned term 1849, the following facts were found.

On the 5th day of *June* 1826, the indenture described in the plaintiffs' bill, was executed and delivered. Of this instrument the following is a copy:

"This indenture of three parts, made and entered into this sixth day of *June*, in the year of our Lord one thousand eight hundred and twenty-six, by and between *Hezekiah Hunting-*

*Hartford,*
August, 1849.
Imlay
*v.*
Huntington.

ton, of the town of *Hartford*, in *Hartford* county and state of *Connecticut*, of the first part; *Sarah Morgan*, late of the town of *New-London*, in *New-London* county, and state aforesaid, of the second part; *James Morgan*, of said town of *New-London*, and *John Morgan*, of the town of *New-London* aforesaid, but now residing in the town of *Hartford* aforesaid, of the third part, witnesseth—

That whereas marriage is intended shortly to be solemnized, by and between the said *Hezekiah Huntington*, party of the first part, and *Sarah Morgan*, party of the second part; and whereas the said *Sarah Morgan* is in expectation of receiving property to which she is entitled under the wills of her grandfather, *James Morgan* Esq., late of *Bath*, deceased, and her aunt, *Mary Morgan*, late of *London*, deceased; and, whereas the parties of the first and second part are desirous of making a provision and settlement for the said *Sarah Morgan*, from the legacies or property to which she may be entitled under the wills aforesaid; and whereas upon the treaty of said marriage between the said *Hezekiah Huntington*, and *Sarah Morgan*, it was agreed between them, that of the legacies or property thus to be received by the said *Sarah Morgan* from the wills of her said grandfather and aunt, the sum of ten thousand dollars should first be paid over to *James Morgan* and *John Morgan*, to be by them held, subject to the order and sole controul of the said *Sarah Morgan* after marriage, and payable to her at her request; and that of the residue and remainder of said legacies or property to be received, under, or by virtue of the wills of said *James Morgan*, Esq., and said *Mary Morgan*, after the deduction of said sum of ten thousand dollars, it was and is further stipulated and agreed, by and between the said *Hezekiah Huntington*, and *Sarah Morgan*, that the one moiety or half part thereof shall be received and retained by the said *Hezekiah Huntington*, as his own absolute property and estate, and that the other moiety or half part thereof shall be paid over to, and be placed in the hands and under the controul of, the said *James Morgan* and *John Morgan*, trustees, to hold the same in trust for the uses and purposes hereinafter declared.     Now, in consideration of said intended marriage, of the premises, and of one dollar to him in hand paid, the said *Hezekiah Huntington* covenants and agrees to and with

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

the said *James Morgan* and *John Morgan*, and the survivor of them, and their successors, that after said intended marriage is celebrated, he will, out of the said legacies or other property of the said *Sarah Morgan*, to be received from the wills of her grandfather, *James Morgan*, and her aunt, *Mary Morgan*, as soon as the same comes to hand, pay over to the said *James Morgan* and *John Morgan* the sum of ten thousand dollars, in trust, for them the said *James Morgan* and *John Morgan*, to hold the said sum of ten thousand dollars, subject to the absolute controul and command of the said *Sarah Morgan*, and to be paid by said trustees to her, or to her order, for her sole and individual use and benefit. And the said *Hezekiah Huntington* further covenants and agrees to and with the said *James Morgan* and *John Morgan*, that after the deduction of said sum of ten thousand dollars from said legacies or property, to be received as aforesaid, and after retaining and reserving for his own individual use, and as and for his own estate, the one half part or moiety of the remainder or residue, he, the said *Hezekiah Huntington,* covenants and agrees to pay over, immediately upon the receipt thereof, the other half part or moiety of said remainder or residue of said legacies or property, into the hands and possession and controul of the said *James Morgan* and *John Morgan*, trustees, who are to hold the same for the purposes herein named, *viz.* to invest the same in the capital stock of the *Bank of the United States*, the certificates or evidences of which investments are to stand in the names of said trustees. The said bank stock to be held in trust, for and during the space of twenty years from the day when said marriage shall be solemnized ; after which period said trustees shall no longer possess or controul the same, but they shall convey said stock to such person or persons as said *Sarah Morgan* shall then designate, and cause the certificates of ownership to be delivered accordingly.

It is further agreed and covenanted, by and between the parties to this indenture, that the said *Bank of the United States* shall be, and hereby are, fully authorized and directed, during the continuance of said trust of said bank stock, to pay the dividends which shall be divided on the same, to said *Sarah Morgan*, or her order only, in the same manner as if said *Sarah Morgan* was unmarried, and her receipt therefor

shall be a full discharge and indemnity for said bank and said trustees.

And in all cases, a majority of said trustees herein before named, or a majority of their successors or substitutes, shall have full and ample power to act in the premises, and upon the death or resignation of any trustee, the vacancy shall be supplied by the nomination or appointment of a suitable person, by the surviving or remaining trustee or trustees, with the approbation and consent of the said *Sarah Morgan;* and in case all the trustees herein before named, or all their successors, should die or resign at the same time, so that there should be a total vacancy in the trusteeship, then the said *Sarah Morgan* may appoint three suitable persons to fill such vacancy. And any one or more trustee or trustees, shall have power to substitute any person to become their attorney for the time being, and such appointment shall be valid, provided the same is made in consequence of the absence, or contemplated absence, of any trustee or trustees from this country; and any substitute or attorney thus appointed, shall have full power and authority to act as trustee, during the continuance of said appointment. And no trustee is to be liable in law or equity to any person but the said *Sarah Morgan*, and to her only so far as he or they may have received into his hands her property; but no trustee or trustees is to be responsible or accountable for the default, miscarriage, or debt of his or their co-trustee. And in all payments which may hereafter be made to the said *Sarah Morgan*, whether of said sum of ten thousand dollars, or of the dividends or interest which may arise or grow due on the investments which may be made by said trustees for her benefit, the receipt of the said *Sarah Morgan* after marriage, shall be a valid and effectual discharge to each and all of said trustees; and the said *Sarah Morgan* alone, even after marriage, shall have the sole and exclusive right and controul to the said sum of ten thousand dollars, and to the dividends and interest which may grow due on the investments to be made by said trustees on her account; and upon the decease of said *Sarah Morgan*, the amount in the hands of the trustees, both of principal and interest, shall descend to her heirs at law, unless her will in the premises, legally made, shall otherwise appoint and direct. And the trustees shall receive for their

services a suitable recompense, together with payment of all their expenses.

And the said *Hezekiah Huntington* hereby agrees, that after the consummation of said intended marriage, he will, in no case, directly or indirectly, interfere in the management or controul of said property in the hands of said trustees, nor will he place any obstacle or hinderance in the way of said trustees, while they hold said office, but will allow his said intended wife to receive for her sole and separate use, all the dividends and interest which may arise and grow due on the property in the hands of said trustees ; and further, that her receipt after marriage shall be a good and valid discharge to each and every of said trustees, for all payments by them or either of them made to her, on account of interest or dividends; and that, upon the decease of the said *Sarah Morgan*, the capital and interest then in the hands of said trustees shall descend to her heirs at law, unless she otherwise order and appoint in and by her last will and testament, legally made and executed.

In witness whereof the parties have hereunto set their hands and seals, the day, month and year, first herein before written.

> *H. Huntington,* [L. s.]
> *Sarah Morgan,* [L s.]
> *James Morgan,* [L. s.]
> *John Morgan,* [L. s.]"

On the 12th day of *June* 1826, said *Huntington* was legally married to said *Sarah Morgan*, and the indenture went into complete effect. On the 22nd day of *June* 1827, said *Huntington*, in right of said *Sarah* then his wife, received under the will and from the estate of her grand-father, *James Morgan*, deceased, the sum of          in money and in stocks by him converted into money ; and afterwards, on the 13th day of *November*, 1838, under the will and from the estate of her aunt, *Mary Morgan*, deceased, the further sum of          in money and in stocks converted in money. The trustees named in the agreement did not invest any portion of the moneys so received by said *Huntington* in the stock of the *Bank of the United States*, which afterwards became insolvent, but permitted him to retain possession of such moneys,

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

without taking or demanding any new bond or other security therefor. On the 16th day of *April* 1846, within twenty years from the time of her marriage, said *Sarah* died, at *Hartford*, intestate, leaving her brothers, said *James Morgan*, *William Morgan* and *John Morgan*, and her niece, said *Lucretia W. Imlay*, her only heirs at law, and entitled to receive whatever sums may be due to her heirs at law, under and by virtue of said indenture. Neither the trustees nor said *Huntington* have ever transferred and paid over to said heirs, or to the administrator of said *Sarah* for their benefit, said trust funds, or any portion thereof. Nor did said *Sarah* or the trustees ever make any demand upon said *Huntington* to pay over the moneys so received by him, or any part thereof, although she was present when they were received and had knowledge thereof; and the trustees had knowledge of the payments to said *Huntington*, very soon after they were made. But said *Sarah* and the trustees permitted said *Huntington* to use and manage these moneys as fully as if no such marriage agreement had ever been made; and they were so used and managed by him, with their knowledge, and without any objection on their part. Out of the moneys so in the hands of said *Huntington*, he paid to Dr. *Archibald Mercer* the sum of 813 dollars, 8 cents, on account of a debt contracted by said *Sarah*, previous to her marriage; and also paid certain debts of her brothers, and loaned to them certain sums, which payments and sums loaned were afterwards repaid. He also, from time to time, expended divers sums of said moneys in support of the two daughters and the son of said *William Morgan*, of which expenditures no account was kept, and the amount of which was not shown to the court. In journeys taken by him in company with his wife, shortly after their marriage and in the year 1826, he expended considerable sums of money, amounting, according to the statement in his answer, to about 800 dollars.

Afterwards, in the year 1827, he went with her to *England*, for the purpose of collecting the legacies due to her from the estate of her grand-father, and in going and returning expended for their passages about the sum of 600 dollars. And having collected said legacies, they afterwards spent a considerable portion of the years 1827 and 1828 in traveling

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

in *Europe,* in part for the benefit of the health of said *Sarah,* which was then feeble, and in part for their gratification and amusement; and, in so doing, expended about the sum of 6,250 dollars in defraying their traveling expenses, and in the purchase of objects of art and taste.

After their return from *Europe,* he sold the building lot which he had previously purchased at an expense of about 1,500 dollars, and purchased another at a cost of 7,440 dollars, and expended in erecting a dwelling-house thereon, between eight and nine thousand dollars, and in furniture for the same, a further sum of about 3,500 dollars, which furniture was afterwards sold at a loss of more than 2,000 dollars. He also, in the year 1838, undertook another voyage to *England* with his wife, for the legacies then due her from her aunt, and was thereby subjected to other considerable expenditures, the amount of which was not shown to the court.

After his return from his last mentioned voyage, he invested in the stock of the *Bank of Illinois* the sum of 4,000 dollars, upon which investment a loss was shortly afterwards sustained to the amount of 2,600 dollars, and that without any fault or negligence on his part.

These expenditures, made after the payment to him of the moneys from the estate of the grand-father of said *Sarah,* were made from the avails of the legacies received by him as aforesaid; and in making them, he consulted the feelings and wishes of his wife, and acted in conformity thereto, and they were made with her knowledge and without objection on her part; and during the whole period of the existence of said marriage relation, said *Sarah* was in delicate health, and was treated by her husband with the most devoted attention.

And as to the allegations in the answer of said *Huntington,* that the trustees and the said *Sarah* abandoned said articles of agreement, and all intention of carrying the same into effect, and relinquished to him the whole of the moneys received by him as aforesaid, and her sole and separate estate therein; the court did not find the same to have been done, by any instrument in writing, executed by them, or any or either of them.

But said *Huntington* claimed to prove the truth of said allegations, by the acts and conduct of the trustees, and of the said *Sarah* and said *Huntington,* as above stated, and also

by her repeated declarations made by her in her life-time. *Hartford,*
And for the purpose of showing a motive on her part, he offer- *August, 1849.*
ed evidence to prove certain declarations made by her, showing
an unfriendly state of feeling towards her brothers and niece. *Imlay v. Huntington.*

To the admission of evidence, to prove such a state of
feeling on her part, the plaintiffs objected. But the court
received the same, subject to said objection; and if it was
competent for said *Huntington* to introduce such evidence to
prove an unfriendly state of feeling towards her said rela-
tives, as a motive for relinquishing her property to him and
cutting them off from all share of the same, then the court
found that said *Sarah* did, at times, manifest feelings un-
friendly to her said brothers and niece; but if such evidence
was not legally admissible, then such fact was not found.

The plaintiffs also objected to any parol evidence to prove
the truth of said allegations, as to the abandonment of said
agreement and the relinquishment of the trust property; but
the court received the same, subject to said objection; and
said *Huntington* introduced the following testimony, to wit:

1. The deposition of Mrs. *Ellen Smith,* of *Philadelphia;*
who testified, substantially, as follows:

I know Mr. *Hezekiah Huntington* of *Hartford* very well.
I knew also his late wife very well. My acquaintance with
them commenced in *Paris,* in *August* 1827. My acquaint-
ance with her continued until her death. The intimacy be-
tween her and me was as great as that of two beings could
be; we were like mother and daughter. Mrs. *Huntington*
was in very delicate health, and the tour was undertaken for
the benefit of her health. She purchased expensive clothing
and jewelry; also table linen, bed linen, *Brussels* carpets,
and house-keeping articles generally. She also bought a
great many presents for her friends; some of them pretty
expensive. Mrs. *Huntington* always told me, that she had
nothing independent of her husband. There were three
persons, she repeatedly said, should not have her property,
if Mr. *Huntington* secured it to her. They were *John Mor-
gan, James Morgan* and *Lucretia W. Starr,* now the wife
of *William E. Imlay.* I often told her, that in case of Mr.
*Huntington's* death, the property would go to his relations,
and that she would be entitled only to her thirds, and urged
upon her the necessity of procuring a conveyance from him.

She never, in any conversation with me, stated, that there had been any settlement, or any marriage articles. I had repeated conversations with her, upon the subject of the property, in which she said, that she had not a dollar independent of Mr. *Huntington.* It is my impression, that Mrs. *Huntington* made journeys, every year after her return from *Europe*, for her health. It was always delicate from my first acquaintance with her. It was my impression, at the time we were traveling in *Europe*, that the money expended in traveling and in making the purchases I have spoken of, was money which came to her upon her marriage. I derived that impression from conversations with her. My anxiety about her property was owing entirely to my being ignorant of the settlement said to have been made at her marriage; having understood from Mrs. *Huntington*, that the property was all Mr. *Huntington's.* The reason given by Mrs. *Huntington* why she would not leave her property to the three persons above named, was, that she thought *James Morgan* and *John Morgan* had not treated her as they ought to have done. She thought they had influenced her mother and brother *Francis* to make their wills as they had done. She told me *that*, time after time. She was grieved at not being mentioned in their wills. The reason why she would not leave anything to *Lucretia*, was, the entire neglect of her, by *Lucretia*, after her, (*Lucretia's*) marriage. She said, she would not leave her even her watch, which she had bought intending to leave her at her death.

2. The testimony of the Rt. Rev. Bishop *Brownell*, who testified, that Mrs. *Huntington*, some three or four years after her marriage, when her husband was sick, requested the witness to talk with her husband about making a will, as his property came by her, and in the event of his decease, two thirds of it would go to his heirs. The witness accordingly stated the request to her husband, who replied, that he did not consider his case alarming, and would postpone making a will until he got well.

3. The testimony of Dr. *George Sumner*, who testified, that it was a common expression of the said *Sarah*, that whatever was her property was her husband's, and whatever was her husband's, was her's.

4. The testimony of Mrs. *Harriet Grosvenor*, who testified

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

that about a year before the death of said *Sarah*, the witness called upon her to contribute some money towards a charitable object, and she told the witness she could not do it, as her husband was pressed for money. The witness then said, she supposed that when she, said *Sarah*, was married, she had an income settled upon her which was her own. To which said *Sarah* replied: " No, that is all done away with ; we have no separate interests."

The witness, a few weeks before the death of said *Sarah*, and in her last sickness, again went to see her, at the request of a friend, and said to her: "I understand you wish to secure your property to your husband, and if so, you ought to do it soon." To which said *Sarah* replied : "That is all settled just as we could wish, or just as we would have it ; that is settled;" when the conversation was interrupted ,by some person coming into the room, and nothing more was said upon the subject.

5. The testimony of *Samuel H. Huntington*, Esq., a brother of said *Hezekiah Huntington*, who testified to a conversation had between him and said *John Morgan*, at *New-York*, in *October*, 1847, and in the absence of the other heirs. The witness testified, that he asked said *John*, in reference to the suit then pending, whether his course was right or just. The said *John* said, that he did—that he thought that if his sister designed that they should not have the property, she would have made a will. To which the said *Samuel* replied: "You know very well the settlement which was made, and she destroyed her part, and supposed that she destroyed the settlement, and that you would have nothing more to do with it." The said *John* then said, destroying the contract did not invalidate or affect his claim. On his cross-examination, he said, he could not say whether the expression was, or was not, that if she destroyed the contract, it would not destroy the claim.

The witness then alluded to her declarations made to him, said *John*, at a Mrs. *Dakins*, in *London*, in the year 1838, after the reception of the second legacy, saying, that she then told him that neither he nor his brother *James* should ever have any thing to do with her property. The said *John* replied, that he supposed she referred to his having the custody of it ; to the trust, and not to the enjoyment of it ; and that the

*Hartford,*
*August, 1849.*

Imlay
*v.*
Huntington.

declarations were the effect of prejudices created by the witness, and referred to letters written by the witness to her respecting the son of *William Morgan,* placed in charge of the witness by her, and afterwards taken from him, by a writ of *habeas corpus,* brought by said *James,* in behalf of said *William,* during her absence.

The plaintiffs, to rebut the aforesaid evidence of said *S. H. Huntington,* and establish their claims, as alleged in their bill, read, in evidence, the following documents, to wit:

1. A letter from said *Sarah* and said *Huntington,* to *Thomas Morgan,* of *London,* bearing date *June* 17th, 1826.

A few extracts only from this document will be given.

My dear Uncle,

It is the greatest pleasure I have had to correspond with you; and although my last letter remains unanswered, I must write a few lines to inform you, that on the 12th of *June,* I was married to Mr. *Hezekiah Huntington* of *Hartford;* my choice you would approve of, if you knew him. I can only say, that he has generous, kind and noble feelings, and will make me a very affectionate companion. I have had one half of my property settled on myself, according to your kind advice, and against his; for he wished me to retain *all* of it. That would have been against my principles; for we intend to have but one interest in every thing; and in that way secure our peace and happiness while we live. I shall leave this letter for my dear husband to finish.

Your grateful and affectionate niece,

*Sarah Morgan Huntington.*

You may probably think it would have been better policy for me to have rested my introduction upon what *Sarah* has said, in the forepart of this letter; yet I thought it better to undeceive you, and at the same time put in a caution to take what she says with all due allowance for her partiality. I should weary youself, and only flatter my vanity, were I to say any more of myself. I shall therefore devote the rest of my paper to giving you information of your family friends here.  *    *    *    *    *  I have not in this enumeration mentioned *Sarah.* She is now under my care, and I assure you, Sir, it will be one great object of my life to render her as happy as her best friends could wish. She would

be very happy to hear from you, but not more so than your sincere friend,

*H. Huntington.*"

2. A letter from the said *Huntington* to *Francis Morgan*, containing an account of disbursments for him, amounting to 353 dollars.

3. A letter from said *Huntington* to Mrs. *Hanham*, of *London*, bearing date *May* 28th, 1829. It contains nothing requiring a place here.

4. The deposition of *Thomas Morgan*, uncle of the said *Sarah*, proving the payment to said *Huntington* of a legacy of about 9000*l*. sterling, given to his wife, by her grand-father, *James Morgan*, deceased, and of another legacy of 4784*l*. 17*s*. 2*d*. consols, bequeathed to her, by her aunt, *Mary Morgan*, deceased.

5. The power of attorney of *James Morgan* to *Ebenezer Learned*, Esq., bearing date *June* 22d, 1826, authorizing said *Learned* to act as trustee, in the place of said *James Morgan*, during his absence from the *United States*, on his con-templated visit to *England*.

But there was no evidence that said *Sarah*, or said *Huntington*, ever had any knowledge that any such power had been executed.

And the court found the testimony of the aforesaid witnesses to be true, as by them given and herein detailed; and that if the facts herein found, and so much of the evidence herein stated, as is legal and admissible evidence in the case, be sufficient to prove the allegations in the answer of said *Huntington* as to the abandonment of the marriage contract and the relinquishment of the trust property, then the court found said allegations to be proved and true; but if they are in-sufficient for that purpose, then the court did not find them to be true.

With respect to the allegation in the plaintiffs' bill, respect-ing the manner in which the moneys received by said *Huntington* were to be held and disposed of, the court found, that if the facts herein found, and the evidence herein stated or referred to, prove said allegation to be true, then the court found the same to be true; if otherwise, then said allegation was not proved.

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

There was no other evidence of any permission, on the part of the trustees, that the moneys received by said *Huntington* should remain in his hands, or be used by or managed by him, than the fact that they did so remain, and were so used and managed, with their knowledge, as herein found.

And the court found, that all the allegations contained in said bill, which are admitted in the answer of the defendant, *Huntington,* and all the facts sworn to by him in his answer, which can be legally proved by his oath annexed to said answer, except so far as they are inconsistent with the facts herein found, and the facts to be found, upon the evidence herein stated, are true: and all other allegations in said bill and answer, not found in manner aforesaid, were not proved.

The case was reserved for the consideration and advice of the supreme court of errors, and the following questions were submitted:

1. Whether the evidence offered by the said *Huntington,* to prove the feelings of his said wife towards her brothers and niece, was legally admissible.

2. Whether parol evidence, in support of the allegations in his answer, relating to an abandonment of the contract and relinquishment of the trust property, was legally admissible.

3. Whether the facts herein found, and so much of the evidence herein stated, as shall be considered legal and admissible for the purpose, are sufficient to prove said allegations.

4. Whether the facts and evidence herein stated are sufficient to prove the allegations in the plaintiffs' bill, as to the manner in which the money, received by said *Huntington,* was to be held and disposed of.

5. Whether, upon the whole case, the plaintiffs are entitled to any, and if any, what relief.

The same conclusions to be drawn from the evidence herein stated, as might have been drawn by the superior court, upon a hearing of the evidence.

The case was very elaborately argued, by

*Toucey* and *Lippitt,* for the plaintiffs; and

*Hungerford* and *Fellowes*, for the defendant *Huntington.* (*a*)

STORRS, J.  The only question presented to us, in this case, respects the liability of one of the defendants, Mr. *Huntington*, to a decree for the payment of the moneys received by him under the wills of the grand-father and aunt of his wife, and which, by the terms of the ante-nuptial agreement between Mr. and Mrs. *H.*, were to be paid over by him to the defendants, *John* and *James Morgan*, as her trustees. No decree is claimed against those trustees, and they, therefore, may be laid out of the case as defendants.

1. That agreement was not, as claimed by the plaintiffs, a marriage settlement, technically so called, by which the interest of Mrs. *H.*, before her marriage, in a part of the moneys to which she was entitled under those wills, was vested, previous to such marriage, in trustees for her use. It contemplated that the legal interest in those moneys should, on the marriage, vest in the husband, as it would, by virtue of the marriage ; and that he should, in that capacity, collect them, and thereupon pay them over into the hands of the persons named in said agreement as the future trustees thereof; and that such trustees should, on the reception thereof, thereafter hold and invest them in trust for her, according to the provisions of the agreement. The trust was not to attach to those moneys until they were thus paid over by Mr. *H.* to the trustees. The agreement, therefore, was merely executory in its character, resting in covenant alone, by which the husband was not to be a trustee, but was bound to collect said moneys and pay them over to *John* and *James Morgan*, who were thereupon, and not before, to become such trustees.

(*a*) The other defendants were interested, as heirs of Mrs. *Huntington*, in having a decree passed against him, and, of course, made no defence. The reporter had made preparation, and had taken some pains, to give a condensed statement of the arguments of counsel, with the authorities cited; but he has changed his purpose, in view of the necessary length of the statement of the case, and of the fact that *the opinion of the court covers*, substantially, the whole ground. Besides, to do justice to the learning and ability displayed by them, if in his power, would require more room than, considering the unusual number of cases to be reported, could well be spared.

This agreement, of course, remained thus executory, until said moneys should be, by Mr. *H.*, paid over to said trustees according to the agreement. Therefore, the mere reception of those moneys, by him, did not constitute an execution of the agreement, which would discharge him from his obligations created by it. And on his neglect to pay over these moneys to the trustees, pursuant to his covenant, after he had received them, she would have had a remedy through and in the names of her trustees, by an action at law, or might herself, in a court of equity, have enforced its specific execution. Or it was competent for her, after these moneys had been received by her husband, and before the agreement should be executed, by his paying them over to the trustees to hold, on the trust provided in the agreement, to discharge her husband from the further fulfilment of the agreement, and to abandon the trust, in the same manner, and to the same extent, as if the agreement were of an ordinary character, and she had remained discovert; because it cannot be doubted, that, by a just construction of the ante-nuptial agreement, its effect was, to give to Mrs. *H.* the sole and separate use, after her marriage, of the moneys so received and paid over by her husband, and therefore to invest her, in a court of equity, with the character and powers of a feme sole in regard to the disposition of them. This power, thus vested in her, to discharge the execution of the agreement, and to abandon the trust, would, of course, be subject to the qualification that there were no terms or stipulations in the agreement, legally valid and operative, to restrain her from so doing. It would be undoubtedly competent for her, before her marriage, and while a feme sole, even with respect to her own absolute property, to enter into a contract to convey it, for a legal consideration, on such terms, that it should subsequently remain for her separate use, with such restrictions upon her controul over it, as she should see fit to impose on herself: but, independently of any such restrictions, when it is limited to her separate use, she retains in equity, after marriage, the same power of disposition over it, both as to the manner in which, and the persons for whose benefit, such power is to be exercised, as she would have, if she had remained unmarried, or if such agreement had not been made. And it is competent for her to exercise this power, equally in favour of her hus-

band, or any other person; although a court of equity would <span style="float:right">*Hartford,*<br>August, 1849.</span> look upon the exercise of such power in favour of her husband, with peculiar jealousy, and would, therefore, refuse to sanction it, unless upon the most satisfactory proof that it was not induced by any undue influence, or improper conduct on his part.

Imlay
*v.*
Huntington.

On this question, whether it was competent for Mrs. *H.,* as between her, or her husband claiming under her, and her brothers, or their representatives, (the plaintiffs here being one of said brothers, and the daughter of another,) to discharge her husband from the performance of this ante-nuptial contract, and the trust contemplated by it, we are of opinion, that there is nothing in the contract which had the effect of preventing Mrs. *H.* from so discharging the execution of it, or abandoning such trust, in favour either of her husband or of any other person, as she should deem fit. The only stipulation, by which the plaintiffs claim that she was so restrained, is that by which it is provided, that, upon her decease, the amount in the hands of the trustees shall descend to her heirs at law, unless she shall, by her will, otherwise appoint and direct. They claim, that, as no such disposition was made by her, of the moneys contemplated by said agreement to be vested in the trustees, her heirs, by the terms of the agreement, became entitled, on her decease, to those moneys. This claim involves the broad question, what is the true construction and effect of this agreement, and of the trust contemplated by it; whether it restricts Mrs. *H.* to such a disposition of the moneys as is expressly authorized by the instrument, or whether, notwithstanding particular modes are therein pointed out, by which she might dispose of them, she might not, by virtue of the general right of disposition which appertains to the absolute ownership of property, make any disposition of it, which is not therein expressly, or by necessary implication, prohibited: and also, whether the acts, which were done by her in relation to them, were not, by a fair construction of the instrument, expressly permitted. We do not propose, in this place, to consider this question, partly because an examination of it may be more conveniently postponed until we shall view the case in another aspect, but principally because it is unnecessary to do so here, by reason of another answer to this claim of the plaintiffs,

*Hartford,*
*August, 1849.*

Imlay
*v.*
Huntington.

which, we think, is entirely conclusive.    It is, that the plaintiffs, claiming here as parties virtually to this agreement, and not through Mrs. *Huntington,* are mere volunteers as against Mr. *H.,* who claims under and in right of his wife ; and that the plaintiffs, therefore, can no more enforce any stipulation in the agreement against him, standing in that situation, than they could against Mrs. *H.* herself.    It is to be borne in mind, that this was a contract made between Mr. and Mrs. *H.* before their intermarriage, respecting the settlement of property of which she was the absolute and exclusive owner, and over the disposition of which she, consequently, then had the most unlimited power.    Being by this contract constituted in equity a feme sole, with respect to it, after her marriage, she retained such power of disposition over it as she would have had, were it not for the execution of the contract, excepting so far as such power was curtailed or taken away, by the terms of the contract itself ; and, as has been already remarked, it was competent for her to impose on herself any restraint which she should see fit.    But, as against whom would she be bound, by that restriction ?    Or, in other words, who could take advantage of it, so as to enforce it, while the agreement remained executory ?    Clearly Mr. *H.,* her husband, alone, or, at the most, the issue of the marriage also, who only would be deemed to come within the influence of the consideration of marriage upon which said agreement was founded.    It is a well settled general principle, that a court of equity will not enforce the execution of an agreement which is not founded on a valuable consideration ; and this principle applies even to agreements under seal, because a court of equity regards the substance, and not the mere *form,* of a thing.    In respect to marriage articles, this principle has been somewhat relaxed.    These agreements, being founded on marriage, which is deemed a valuable consideration, will, of course, be enforced at the instance of the husband or wife, who are parties to such agreement.    It is likewise settled, that they may be enforced also, unless, perhaps, against the settler, by those who are within the scope of the marriage consideration, although not parties to the agreement, and therefore, strictly speaking, volunteers.    But none are considered to be thus within the scope of such consideration, excepting the wife, the children of the marriage

and their descendants, or those who claim through them. This exception to the general rule, in favour of the wife and children, is founded on the reason that for them the settler is under a natural and moral obligation to provide. This reason, however, is not applicable to a brother or sister; and we do not perceive, therefore, why the general rule should not be applied as well to them as to any other volunteers who are strangers to the consideration of the agreement. And we have not found, nor have we been referred to, any authority, which places them on any better ground than ordinary volunteers as to their right to claim an execution of marriage articles. *Atherly on Marriage Settlements*, 125. & seq. 1 *Story Eq. p.* 414. § 433. *Stackpoole* v. *Stackpoole*, 2 *Conner & Lawson*, 489.

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

To the claim of the plaintiffs, that they are entitled, independently of the ante-nuptial contract, as the heirs of Mrs. *Huntington*, to the moneys contemplated by it to be paid to the trustees for her separate use, it is a conclusive answer, that if, as against the plaintiffs, it was competent for her to abandon that contract and relinquish the trust provided for in it, and she has done so, the effect of such abandonment and relinquishment would be to destroy her separate estate in those moneys; because they would not become her separate estate after her marriage, excepting by virtue of the agreement, and, consequently, would cease to be such, when such agreement and the trust contemplated therein were abandoned; and on such abandonment and destruction of her separate estate, the property therein would vest in her husband. And the right of her heirs, *as such*, would instantly cease, when it ceased to be her separate estate; because their right, as such heirs, is founded solely on the ground, that by her having a separate estate in the property, she is in the situation of a feme sole in regard to it.

The only enquiry which remains, on this view of the case, is, whether Mrs. *H.* abandoned and relinquished the antenuptial agreement and the trust contemplated in it, in favour of her husband.

On this question, which is one merely of fact, the evidence need not be of a technical character. No written instrument is required, in order to constitute such relinquishment. It may be proved, by any legal evidence, of whatever charac-

HARVARD LAW SCHOOL LIBRARY.

ter, which is sufficient to satisfy the mind of its existence. *Pawlett* v. *Delaval*, 2 *Ves.* 669.   See also 11 *Verm.* 549.   2 *Aikin*, 427.   7 *Johns. R.* 476.   We do not propose to examine the evidence in this case on this question in detail.   It consists of a great variety of conduct on the part of Mr. and Mrs. *H.* in relation to the management, expenditure, appropriation, and investment of the fund ;  of the conduct of the trustees, named in the articles, in regard to it :  and of the most explicit declarations by Mrs. *H.* respecting these subjects ;  such declarations having been made with a full knowledge by her of all that had been done by Mr. *H.* and the trustees, which, taken together, lead irresistibly to the conviction, that from the time when this fund was received by Mr. *H.*, the original design of him and his wife, when the contract was executed, of placing it in the hands of trustees for her separate use, and the other purposes mentioned in it, was entirely relinquished ;  and that it was her intention to abandon any separate interest in the property, and to give it absolutely to her husband ;  and that it was ever afterwards, with her full knowledge, approbation, concurrence and authority, evinced in every practicable manner in her power, and treated, in every respect, by him, as if it were absolutely his own.   Nor is there the slightest evidence to show, that she was induced thus to part with her separate rights in the property, by any fraud, compulsion, undue influence or improper act on his part.   On the contrary, the proof clearly shows, that she was prompted to this course, by an affection, heightened by the most uniform and devoted attention, on his part, to her feelings and wishes, and his most incessant efforts to promote her comfort and happiness.

In this view of the case, we are of opinion, that, in respect to these moneys thus received by Mr. *H.* from his wife's estate, he is in no manner accountable to the plaintiffs.

2. If, however, this case is considered in the most favourable aspect for the plaintiffs, and it be conceded, as claimed by them, that they are, by the terms of the agreement, to be deemed, not mere volunteers, but purchasers, for a valuable consideration, of the property, which, by the provisions of that agreement, was to be settled in trust for the separate use of Mrs. *H.*, subject to the rights reserved to her, by the true construction of the agreement ;  and that, as against them, it

was not competent for her to discharge the execution of the agreement, and abandon the trust ; and that, therefore, Mr. *H.*, by the reception of the property, became, in equity, as he undoubtedly would, a trustee of it, in the same manner, and on the same terms, and to the same extent, as the persons therein designated as the trustees would, if he had paid the moneys over to them, as stipulated in the agreement,—we are, notwithstanding, of opinion, that, on the best considered and most authoritative decisions, Mrs. *H.*, *by the very terms of the agreement*, retained the right of disposing of the moneys to her husband ; and that the evidence clearly shows, that she exercised that right, in the present case. In this point of view, her power of disposition, as to the property, is to be considered precisely the same as if it had been conveyed by Mr. *H.* to the trustees, as provided by the agreement, and the extent of such power depends entirely on the construction and effect which is to be given to the agreement. As Mrs. *H.*, being the absolute owner of the property, might convey it, on such terms, that she should, after the marriage, have no power whatever to controul or dispose of it, or might retain the full power of disposition over it, or such power qualified or restricted as she should see fit ; and as a court of equity would regard the limitations of it in such conveyance as the law by which it would be governed ; she would, on a conveyance of it, retain over it the *jus disponendi*, which is incident to the ownership of property, excepting so far as that right should be impaired or taken away, by the terms of the conveyance. The inquiry, therefore, as to the power of Mrs. *H.*, after her marriage, to dispose of this property, resolves itself into the question, how far such power was impaired, by the ante-nuptial contract. In regard to conveyances in trust, where the terms of them are not so clear and explicit as to place the intention of the grantor beyond all doubt, and it therefore becomes necessary to resort to construction, in order to ascertain his meaning, the rules of construction, the only object of which is to determine the intention of parties, are widely different between conveyances where it is the object of the grantor to convey his property, and to retain a future power in himself of disposing of it, but to restrict himself from exercising such power excepting in a particular mode, and conveyances, where it is his object to place it entirely beyond

*Hartford,*
*August, 1849.*
Imlay
*v.*
Huntington.

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

his own controul, but to confer upon a third person the power of changing such disposition of it. To use the words of a most sensible writer on this subject, in the former of these cases : " The maker of the deed was the owner of the estate, and in the act he was about, when he made the instrument, he was putting himself under restrictions, to which, by law, he was not subject, and consequently, curtailing those powers and privileges which ensue the plenitude of ownership ; and as the disposition of man, generally speaking, is rather to enlarge his capacity of acting with respect to his property than to narrow it, the facts apparent on such a deed furnish strong presumptive evidence that the owner of the estate did not intend, by such instrument, to restrain himself further than the words he used imported, when taken in their narrowest, loosest and least strict sense. Such restraining words or phrases, therefore, when used by the owner of an estate, confining his ownership to be exercised only through the medium of a power, ought to receive a liberal construction, and such as is most favourable to such owner." But in the latter case, " As the disposition of mankind, generally speaking, is to use great caution in permitting others to exercise acts of ownership over their estates, and as such restrictions are there placed, with a view to protect and take care of the owner, or his representatives entitled to the estate subject to the power, such a deed furnishes facts from whence presumptive evidence may be deduced that the creator of the power so circumstanced, intended that the restrictive words there used, should be taken in their most efficacious sense : in such case, therefore, they should be expounded, with respect to the donee, according to their most enlarged and operative import." *Powell on Powers, Preface*, viii. This is a distinction of great importance, and which it is necessary to bear in mind in this case ; and an attention to it will serve to enable us to place a proper construction on the instrument, to discriminate between the cases cited by the parties on the argument, and perhaps to reconcile at least some of the cases which might otherwise seem to be contradictory.

As to the first fund of 10,000 dollars, to be paid over by Mr. *H.* to the trustees, from the moneys received on the legacies to his wife, there is not only no restriction in the contract upon her power of disposing of it after marriage, but a

reference to it will show, that language could not be devised, which would more plainly or effectually reserve to Mrs. *H.* the same absolute, exclusive and plenary power, as to the disposition of this fund, as would attend the ownership of it, if she had continued a feme sole.

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

As to the second, or moiety fund, which was to be invested, by the trustees, in the stock of the *Bank of the United States,* and which is now to be considered as represented by the amount received by Mr. *H.,* and presumed to be in his hands,—the only express provision in the contract respecting its disposition by Mrs. *H.,* excepting by her will, is, that said stock shall be held in trust for the period of twenty years from the solemnization of the marriage, (during which time she was to receive the dividends thereon, as if she was unmarried,) and that the trustees shall, after that time, no longer possess or controul the same; and that said trustees shall convey said stock to such person or persons as she shall then designate."

That Mrs *H.* was entitled, by the express terms of this instrument, to a separate estate in the *income* of this fund, during the time while it was thus to be held in trust, and that therefore she had then all the power of a feme sole over such income, has not been questioned.

But the plaintiffs insist, that, as to the *principal* of it, she had no power over it, during that period, unless to make an appointment of it by will; and that as she died before the expiration of that period, without making any such appointment, it remained, by the terms of the instrument, to be distributed or paid over, at her death, to her heirs at law.

Although the phrase used in regard to her designation of the persons to whom the principal of that fund should be conveyed, by the trustees, after the expiration of that period, is susceptible of that meaning, and such an interpretation of it would comport with its most literal and obvious terms, if it were looked at as a mere insulated expression: yet, when the other parts of the instrument, its general scope and object, and the consequences of attaching such a meaning to the phrase, are considered, such a construction appears quite too narrow, and not to express the intention and design of the parties, which it should be our great object to ascertain.

By the most sensible and rational construction of this clause, the principal of this moiety fund was intended to con-

tinue to be invested, in the name of the trustees, in the stock of the *Bank of the United States,* for the period of twenty years from the solemnization of the marriage, after the expiration of which time, they were to convey it to whomsoever Mrs. *H.* should, either at that or any other time, whether before or after the expiration of that period, designate. The stock was not to be transferred until the expiration of twenty years ; but the designation of the person to whom it should be then transferred, might be made by her, at any time. The expression used, in regard to the designation by her, is, on any construction, elliptical ; and we consider that the word " then," notwithstanding its immediate connexion with the term " designate," as referring to the time when the stock should be enjoyed, by the person to whom it was to be conveyed in pursuance of her designation, rather than to the time when such designation should take place. If the expression had been, *as she shall designate then to receive it,* or *as shall at that time be designated by her,* there would be no question that the designation might have been made at any time. We think that the real import of the terms here used is the same as if one of these phrases had been used. One moiety of the money, of which the other moiety constitutes this fund, was to belong to Mrs. *Huntington.* The other was to be invested, by the trustees, for the use of his wife. They were *her* trustees ; and, by the terms of the contract, were not to be liable to any person but her. She was to receive the income of this fund, for her own separate use, for a particular period. She reserved the power of directing to whom the fund should then be conveyed, and if no such direction should be given, of disposing of it by will. It is plain that her husband was not intended to have any interest in or power over it, by virtue of his marriage. If not disposed of, in her life-time, by a conveyance of it, nor by will, it was to be paid to her heirs. It is obvious from these provisions, that she was not to be restricted, in regard to the disposition of this fund, excepting by that particular provision requiring it to remain in the names of the trustees for the period of twenty years, during which she was to be entitled to receive the income of it. And it is now well settled, that she would not be restricted in the reception of that income to the times when the dividends should have been made on the stock in

which the fund was invested; but that, there being no ex- <span style="float:right">*Hartford,*</span> press restriction against an anticipation of such income by <span style="float:right">August, 1849.</span> her, she might have anticipated it. We perceive no reason <span style="float:right">Imlay</span> why her disposition, before the expiration of the twenty <span style="float:right">Huntington.</span> years, of the reversion of this fund, would not be valid, by the terms of this instrument, which would not also invalidate a disposition of it in case of her death within that period, by her will, previously executed. That such an appointment by will would be valid, under this instrument, we can entertain no doubt. We can perceive no good reason for believing, that the parties to this contract intended, that within the twenty years she might dispose of this reversion, by will, and by no other mode. That she might have restricted herself from designating, during that period, the persons to whom this fund should be conveyed, by the trustees, by terms so clear and explicit as to admit of no other construction, there is no doubt: but even in case of a power of appointment given to a third person, where the construction is more un-favourable to the settler than in a case like the present, where the settler is imposing restrictions on herself, the rule is, that phrases similar to that on which the plaintiffs rely on this point, are, unless they are thus clear and explicit, to be con-strued as conferring a power which is general as to the time of its execution. 1 *Sugden on Powers, ch. 6. p.* 330. § 6. and cases cited.

But without relying on the construction of the express power reserved to Mrs. *H.*, by this instrument, in regard to the disposition of the property in question, we are of opinion that the principle is established, by the decided weight of au-thorities, in this country, in accordance with what is now uni-versally conceded to be the established doctrine in *England*, that an ante-nuptial settlement, by a woman, of her property, to her separate use after marriage, gives her, in equity, the full power of disposing of such property, by any suitable act or mode of conveyance, in the same manner, and to the same extent, as if she were a feme sole, excepting so far as there is some express or implied restriction upon such power of disposition in the instrument of settlement; and that no such restriction is implied from the circumstance that it is pro-vided, in such settlement, that she may dispose of it in any particular mode therein pointed out; but that such provision

*Hartford,*
*August, 1849.*

Imlay
*v.*
Huntington.

must, either expressly, or by necessary implication, exclude any other mode of disposition, in order to constitute such a restriction; and that, where her property is so settled for her separate use, through the medium of a trust created for that purpose, she may exercise such power of disposition, without the assent of her trustees, unless such assent is made necessary by the terms of the instrument, although such assent, if necessary, is fully shown by the acts of the trustees, in this case.

These principles are settled in *England*, by a series of decisions from a very early period down to the present time, unbroken, excepting by a very few cases decided by Sir *R. P. Arden*, Master of the Rolls, and Lord *Loughborough*, in which they attempted to establish a different doctrine, but which were afterwards repudiated by Lord Chancellor *Eldon*, who restored the law to its ancient principle, and in *Parks* v. *White*, 11 *Vesey* jr. 209, after reviewing all the authorities, pronounced the doctrine of those cases to be in opposition to all the previous authorities for a century: since the decision of which last case, the law of that country has been considered as settled in accordance with the earlier authorities. We do not propose to examine the numerous *English* cases on the subject. It is unnecessary to do so, especially after the minute and careful review of them by Lord *Eldon*, in the case referred to, by Chancellor *Desaussure*, in *Ewing* v. *Smith* & al. 3 *Desaus. R.* 417. and by *Spencer*, C. J. and *Platt*, J. in *Jaques* v. *Meth. Epis. Church*, 17 *Johns. R.* 548. to which it is sufficient to refer.

In this country, the decisions on the subject have not been uniform. In *Ewing* v. *Smith* & al., decided in 1811, Chancellor *Desaussure*, in the circuit court (of equity) of *South Carolina*, adopted the principle as now settled in *England*. His opinion was, however, overruled, by a majority of the court of appeals of that state, who admitted, that his opinion was in conformity with the *English* law, but proceeded on the ground that the question in that state was to be considered as *res nova*, and that in consequence of a statute prevailing there, they were not bound by the *English* decisions; and in that state, the decision of the court of appeals has not since been departed from. In 1820, the subject was most thoroughly and ably examined, by the supreme court of errors in the state of *New-York*, in *Jaques* v. *The Meth. Ep.*

*Church* before mentioned, and that court, in opposition to the opinion of Chancellor *Kent*, adopted the *English* rule, which has since been uniformly recognized in that state. In that case, Ch. J. *Spencer* declared the principle established by the cases to be, that "a feme covert, with respect to her separate estate, is to be regarded, in a court of equity, as a feme sole, and may dispose of her property without the consent or concurrence of her trustees, unless she is specially restrained by the instrument under which she acquires her separate estate;" and *Platt*, J. says, that the rule is, "that a feme covert, having a separate estate, is to be regarded as a feme sole as to her right of contracting for and disposing of it. The *jus disponendi* is incident to her separate property, and follows, of course, by implication. She may give it to whom she pleases, or charge it with the debts of her husband, provided no undue influence be exerted over her; and her disposition of it will be sanctioned and enforced, by a court of equity, without the assent of her trustee, unless that assent be expressly made necessary, by the instrument creating the trust. And the specification of any *particular mode* of exercising her disposing power, does not deprive her of any *other mode* of using that right, not expressly or by necessary construction, *negatived* in the devise or deed of settlement." In *Tennessee*, *Mississippi* and *Virginia*, and as it would seem, in *Pennsylvania*, the contrary rule prevails. In *North-Carolina*, *Alabama* and *Kentucky*, the question appears to be undetermined. *White & Tudor's Leading Cases in Equity*, *p.* 370. & seq.—(*Amer.* ed. note by *Amer.* editor.) We adopt the *English* rule, not only as supported by the highest authority, but because we think it is also supported by the strongest reasons. Those reasons are most clearly and forcibly stated, by the distinguished judges whose opinions we have referred to, in *Jaques* v. *The Meth. Ep. Church*. We think they are unanswerable, and deem it necessary only to refer to the views expressed in those opinions as expressive of our own. *Clancy* on *Husb. & Wife*, *b.* 3. *ch.* 5. 6. 7. *p.* 282. & seq. 2 *Story Eq.* 623.

The decisions adopted by us, extend the rule of construction, established by them, not only to settlements of property made by the owner upon a married woman for her separate use, and where, therefore, the enquiry respects the extent of

*Hartford,*<br>August, 1849.<br><br>Imlay<br>*v.*<br>Huntington.

a delegation of power to her, by a third person ; but also to settlements made by a married woman of property, of which she is herself the owner to her own separate use, and where the rights which flow from such separate estate constitute not a delegation, but a reservation of power to herself over it, and any restrictions imposed on herself as to her future right of disposing of it, are only qualifications of such power, and where, therefore, the enquiry respects only the extent of such restrictions.　It is, therefore, sufficient for us here only to determine that such rule of construction should be adopted, as we are of opinion that it should be, in the latter of these cases, which is the one now under consideration.　We think that neither the provision that Mrs. *H.* might dispose of the moneys in question by will, nor that respecting her designation of the person to whom the reversion of the second fund should be conveyed, operated to prevent her, at any time, from disposing of the principal and interest of the first fund, or the income and reversion of the other ; and that they being limited to her separate use, she had the full power of a feme sole in regard to their disposition.

That this property was a proper subject of disposition by gift, admits of no doubt ; and the only remaining question is, whether Mrs. *H.* made such a disposition of it to her husband.　On this qustion, her acts, declarations and confessions, are evidence in the same manner and to the same extent as if she were a feme sole.　We have already expressed our opinion as to the effect of the evidence before us on the question which arose upon the first view which we took of this case, and the remarks there made are applicable to the present point.　Without further pursuing the subject, we cannot entertain a doubt, that the evidence most clearly shows, that here was an executed gift by Mrs. *H.* of all her property in the moneys now claimed by the plaintiffs, and that this bill, therefore, cannot be sustained.

It would not be difficult, by a reference to the peculiar circumstances of this case, to show the absolute and great injustice of permitting the plaintiffs, asserting a right here under Mrs. *H.* as her heirs, to reclaim from her husband these moneys, after the expenditure by him of a part of them, with her approbation and concurrence, and, it may be fairly presumed, at her instance, principally for her health and com-

fort, and the just expectation on his part, superinduced by her conduct, that he would be allowed to enjoy the remainder, and the course of life which he has been led and encouraged to pursue in consequence of such reasonable expectations. But it is unnecessary to pursue this topic. *Powell* v. *Starkey,* 2 *P. Wms.* 82.

*Hartford.*
*August,* 1849.

Imlay
*v.*
Huntington.

We have thus expressed our views of this case, as briefly as possible, without being unintelligible, and yet more at large than if it were not the first in which the power of married women to dispose of property reserved or limited to their separate use, has arisen in our courts; and for the sake of avoiding prolixity, have preferred a reference to the numerous authorities on the subject, to a minute detail of them. And we come to the conclusion,

1. That the ante-nuptial contract in question was executory in its character; that before its execution it was competent for Mrs. *H.* to discharge Mr. *H.* from executing it, and to abandon the trust created by it; and that she did so abandon it in his favour.

2. That if the trust, as against Mr. *H.*, be considered as having been executed, Mrs. *H.*, by a just construction of the contract, retained the separate use of the property in question, with a power of disposing of it, at any time, unrestricted, except as to the time when the principal of the second fund was to be transferred by the trustees.

3. That independently of such construction of the express terms of said contract, inasmuch as she retained by it the separate use of the property, without any express or implied restriction qualifying that separate use, so as to prevent her from exercising the power of disposing of the property at her pleasure, she had such power as incidental to her separate ownership of it.

4. That in either of the two last cases, she is to be regarded in equity as a feme sole in respect to her right of disposing of said property; that it was competent for her to exercise such right in favour of her husband; and that she gave the property to him, without any force, fraud, undue influence, or improper conduct on his part.

On each of these grounds we think that the plaintiffs have

*Hartford,*
August, 1849.

Imlay
*v.*
Huntington.

no claim on Mr. *H.* for the funds in question ; and therefore, we advise the superior court, that the bill be dismissed.

In this opinion the other Judges concurred, except ELLS-WORTH, J., who gave no opinion.

Bill to be dismissed.