## WILLIAM J. BOARDMAN'S APPEAL FROM PROBATE.

By an ante-nuptial contract between *B* and *L* in 1857 *B* agreed that certain bank and other stocks, then conveyed by him to a trustee, should be held by the trustee for the sole use of *L* during her life, and be subject to any disposition she might make of them by will or written appointment; the same to be in lieu of dower and of all distributory share of his personal property if she should survive him. Held that the right to the income from the stocks did not, under the statute (Gen. Statutes, tit. 13, sec. 20,) vest in the husband on the marriage, but that it belonged to the wife as her sole and separate estate.

After the marriage in 1857 until his death in 1871 *B* received the dividends upon the stocks, upon a power of attorney from the trustee, without objection from his wife, rendering no account to her and keeping none, she not notifying him in any way that she should claim them as her own. It was found however that she had never in fact intended to relinquish her right to them and did not suppose she had done so; that she supposed he was investing them for her benefit, a belief which was strengthened by occasional expressions of his; and that from motives of delicacy she did not enquire of him, he being uncommunicative on all business matters. It also appeared that the dividends were not needed or used for family support, *B's* income from other property being far in excess of the family expenditures. Held that she was entitled to recover their whole amount from his estate, with interest.

A large amount of the dividends so received by *B* had been from time to time invested by him in the name of the trustee in additional stocks of the same

description. In 1870 *B* procured a power of attorney from the trustee and transferred to himself all the stocks so acquired, intending to convert them to his own use. His wife had no knowledge of the transaction, and did not in fact know until after *B's* death that the dividends from the original trust stocks had been invested in such additional trust stocks. Held that her rights were not affected by the transaction.

*B*, soon after this transaction and in pursuance of a general purpose, made a new will, in which he referred to the ante-nuptial contract and confirmed it, and gave to his widow his mansion house and two hundred thousand dollars for her life; stating his object to be to make abundant provision for her support and comfort, in lieu of dower and of all share in his real and personal estate. It appeared from evidence outside of the will that *B* did not expect his widow to make a claim upon his estate for the dividends he had received and that he made the foregoing provision for her in his will in that belief; also that the provisions of the will in her favor had been made known to her and that she had expressed herself fully satisfied with them. Held that it was of questionable propriety to go outside of the will for evidence of the purpose and understanding of the testator; but that the will, taken by itself or in connection with the facts stated, did not make the acceptance of its provisions by the widow a bar of her right to present a claim against the estate for an indebtedness.

And held that her right to any portion of the sums received by *B* as dividends was not barred by the statute of limitations.

APPEAL from a decree of the probate court of the district of New Haven, accepting and approving the separate administration account of Lucy H. Boardman, one of the executors of the will of William W. Boardman, deceased, and making a special order upon a petition accompanying the account; taken to the Superior Court in New Haven County.

The petition accompanying the account was as follows:

"To the Court of Probate for the district of New Haven, the undersigned, Lucy H. Boardman, Executrix on the estate of William W. Boardman, hereby presents her separate account against said estate, as follows:—Estate of William W. Boardman, to Lucy H. Boardman, *Dr.*—To amount of interest, dividends and money collected by William W. Boardman from the 28th day of July, 1857, to the 27th day of August, 1871, being cash and funds due to her for her sole and separate use under and pursuant to an ante-nuptial agreement, with interest thereon, as per exhibit hereunto annexed, which said sums the said Lucy claims as due to her on the ground that said William W. Boardman was indebted

to her, and that his executors and estate are now indebted to her, to said amount for moneys had and received by him to her use, and also on the ground that said William W. Boardman received said sums with notice of said ante-nuptial agreement, and charged with the trust created thereby, and became as to said sums trustee for her, so that he and his executors became liable to pay the same to her. The undersigned presents this separate and supplemental account as a part of her administration account—the other part of said administration account being the account of this date, signed by herself and her co-executor ; and both of said partial accounts are presented together by the undersigned, and constitute together the whole administration account of said estate to this date. In presenting this account, the undersigned informs the court and alleges that, although the amount charged in said account is justly and legally due to her in her personal capacity from said estate, her co-executor on his part declines and refuses to allow the same as a valid claim against said estate. And the undersigned claims and alleges that she has a lawful right to retain and pay to herself, and appropriate to her own use, out of the funds of said estate in her hands, enough money to pay her said claim in full, with interest on the principal of said claim, down to the date when she shall make to herself such appropriation, retention, and payment. And the undersigned admits that she holds in her individual custody certain property belonging to said estate, and inventoried as a part thereof, whereof the legal title remains in said co-executor and herself, as follows. [Here follows a list of stocks and bonds, amounting in the whole to $118,000.] The undersigned therefore prays the court to accept and allow her said account, and to authorize and direct her to sell the assets and property of said estate in her hands, so far as may be necessary for the satisfaction and payment of the amount due to her by said account, together with lawful interest upon the principal of the amount so due her by said account down to the date of the satisfaction and payment of said account, and to authorize and direct her to thereupon retain, and appropriate and pay to herself in her

personal capacity, for her own use in her said personal capacity, the amount now due to her as aforesaid upon her said account, together with the lawful interest which shall accrue, down to the date of such retention, appropriation and payment, upon the principal of the sum so due to her as aforesaid. Dated at New Haven, this 20th day of April, 1872."

To this petition was annexed a schedule of dividends paid by the Delaware & Hudson Canal Company, the Market National Bank, and the Bank of New York, from the 28th of July, 1857, to the 27th of August, 1871, amounting in the whole to $65,991, to which was added interest to April 20th, 1872, $25,961.08, making the whole sum $91,952.08.

Upon this petition the probate court, having found its allegations to be true, made the following decree:—

" *Ordered.*—That said accounts be accepted and allowed, and that said executrix be authorized and directed to retain and appropriate and pay to herself in her personal capacity, for her own use in her said personal capacity, out of the assets and property of said estate in her hands, the amount now due to her as appearing by said separate account, together with the lawful interest which shall accrue down to the date of her said retention, appropriation and payment, upon the principal of the sum so due to her as aforesaid."

From this decree the present appeal was taken by William J. Boardman, both as joint executor with the said Lucy H. Boardman, and as one of the residuary devisees and legatees under the will.

In the Superior Court the case was referred to a committee, who reported the following facts:

William W. Boardman, late of New Haven, deceased, and Miss Lucy Hall, of Cleveland, Ohio, were married at Cleveland, on the 28th day of July, 1857. His age was then sixty-four, and her age thirty-eight. Her father and mother were deceased. She had a brother and sister then and still living. The parties had been acquainted for many years. Mr. Boardman was then possessed of an estate amounting to from $400,000 to $500,000. Miss Hall had a patrimony of about $6,000.

Prior to the 24th day of July, 1857, Mr. Boardman transferred to his sister, Cornelia E. Boardman, in trust, two hundred shares of the stock of the Delaware & Hudson Canal Company, one hundred and twenty shares of the stock of the Bank of New York, and one hundred shares of the stock of the Market Bank of New York, belonging to him, and also drew up in his own handwriting an ante-nuptial agreement between himself, his intended wife, and the said Cornelia E. Boardman. The transfer of stocks was made and the agreement was drawn up without any previous consultation or arrangement with Miss Hall. On the 24th day of July, 1857, Mr. Boardman presented the agreement to Miss Hall, and stated to her that he had been a director in the New York & New Haven Railroad Company, and that there was danger of his property being taken by the creditors of the company on account of the frauds of Mr. Schuyler, the president, and he thought it was best for her that some arrangement of the kind should be made. The agreement was thereupon executed as and for a valid and binding agreement upon the parties, for the uses and purposes therein mentioned.

The agreement was as follows:—" Whereas a marriage is contemplated, and is now about to be solemnized, between William W. Boardman of New Haven, Connecticut, and Lucy Hall of Cleveland, Ohio :—In consideration thereof, it is by the said parties understood, agreed and settled, that the following property and stocks, which have recently, by the said William been conveyed in trust for this purpose to his sister, Cornelia E. Boardman, to wit: Two hundred shares of the Delaware & Hudson Canal Company stock: one hundred and twenty shares of the stock of the Bank of New York; and one hundred shares of the stock of the Market Bank, all said institutions situated in, or having officers in, the city of New York,—shall, by the said Cornelia, be held in trust for the sole use and benefit of said Lucy during her life, and after her decease shall be subject to such disposition as the said Lucy by will, or by any proper appointment in writing in the nature of a will, may direct. It is further agreed and settled that the property and estate now appertaining and

belonging to the said Lucy shall be and remain hers to her own sole and separate use and disposition, to all intents and purposes. It is also further understood and agreed, in consideration of the premises, that in the event of the demise of the said William, leaving the said Lucy surviving, she will not claim or receive any dower in the real estate of the said William wherever situated, nor any distributory share in his personal property, except as the same may be devised or bequeathed to her in the last will and testament of the said William; the provision in this marriage settlement being intended and accepted in lieu and in full of dower and of widow's statutory right, in both the real and personal property of said W. W. Boardman.    Cleveland, 24th July, 1857.

In presence of                W. W. Boardman,
        Edward Wade.          Lucy Hall,
                              Cornelia E. Boardman."

Prior to the marriage Mr. Boardman made his will. The contents of this were not made known to his wife, but only the fact that he had made his will. He suggested to Miss Hall the propriety of her making a will, as she had this power of appointment, and she thereupon and before her marriage made a will by which she gave the trust fund to the said Cornelia E. Boardman. This act was voluntary on her part, and without consultation with Mr. Boardman. Soon after the marriage the parties sailed for Europe and were absent about a year.

They again went to Europe in September, 1866. Just before going Mr. Boardman, at his wife's request, drew up for her a will. The first will was presented to him, from which he copied the provision of the first in relation to the trust. The provisions of this will, as well as of the first one, were of her own volition, and were not at all influenced by Mr. Boardman. Some time after their return from Europe the second time, Mrs. Boardman expressed to her husband a desire to make some change in relation to the disposition of the trust fund, and requested him to bring her will from the bank for that purpose, and he did so, and informed her that

when she had made up her mind in regard to the disposition that she wished to make, he would prepare a will for her. They soon after went to Hartford to visit an institution there, to which she had some idea of giving a portion of the fund. On the 20th of August, 1869, Mrs. Boardman canceled the disposition made by her will of the trust fund, and never made any new disposition of the same until after the death of her husband. At the time of the revocation, she had made up her mind to make some change in the disposition of the trust fund, but had not decided what, and therefore never called upon her husband to draw up a new will for her. Her husband had full knowledge of a proposed change in her will, and was willing that she should exercise her own choice in regard to it, and never attempted to influence her in regard to the disposition of the fund. She never communicated to him the fact that she had revoked that provision of her will. The fact that such communication was not made was not due to any desire of concealment on her part, but because she had not made up her mind what change she would make, and because of a general reticence between them in relation to business matters.

Mr. Boardman, at some time which did not appear, destroyed the will made by him just prior to his marriage, and on the 19th day of March, 1870, made and published his last will and testament of said date. He died on the 27th of August, 1871, and the will was duly admitted to probate by the proper court. The contents of the first will were never known to his wife, and those of the second were not made known to her until about two weeks before his death, as hereinafter stated. There was never any conversation between them in relation to the provision which he should make for her by will, if any. He never consulted with her in relation to his will, and she never made any suggestions to him in relation to it. The will was drawn up by Mr. Boardman himself.

The parts of the will important to the present case are as follows:—

" I, William W. Boardman, of the city and county of New

Haven, Connecticut, do make and publish this my last will and testament, intending it as a disposition of all my estate, both real and personal, wherever situated, after my decease, all just claims and expenses being first paid.

"*Item first.*—The settlement I made with. my dear wife, Lucy H. Boardman, before our intermarriage, in lieu of dower, is hereby confirmed, and in addition to the provision therein made for her, I hereby give and devise to her the mansion house, grounds and buildings where we now live, bounded easterly by Hillhouse Avenue, and westerly by Prospect Street, to be her's for and during her natural life.' And after her death my will is that said house and grounds shall go to my dear sister, Cornelia E. Boardman, and I do hereby devise the same to her and her heirs forever.

"*Item second.*—To my dear wife, Lucy H. Boardman, I give and bequeath all my household furniture, clothing, plate, pictures, and money in my house, and all my horses, carriages, harnesses, &c., and all other personal property in possession in my house or out houses on said grounds, at the time of my decease, to be her's forever and absolutely, and my will is that no special or particular inventory thereof shall be made.

"*Item third.*—I further give and devise to my executors, hereinafter named, and the survivor of them, in trust for the use and benefit of my dear wife, Lucy, during her natural life, two hundred thousand dollars, to be taken from such part or parts of the property I may own at my decease, not herein before devised to her, as she, the said Lucy, may desire and select, at the appraisal in the inventory; the dividends, rents and profits to go to and belong to my beloved wife, to her sole and separate use, during her natural life, with reversion over after her death to the uses and appointments set forth in my last will, and in the codicil thereto, if any. My intention and object was and is to make abundant provision for the support and comfort of my dear wife, by the three preceding items, in lieu of dower or share in my real or personal estate.

"*Item ninth.*—I do hereby constitute and appoint my dear

wife, Lucy H. Boardman, executrix, and my nephew, William J. Boardman, executor, of this my last will and testament, hereby revoking all other wills by me heretofore made, and declaring this and this only to be my last will and testament."

After the marriage Mr. Boardman, from time to time, procured orders from the trustee for the collection of the dividends upon the trust fund. These dividends were collected through his bankers in New York, Whitehouse, Son & Morrison, afterwards Whitehouse & Co., and were placed by them to his credit, in common with dividends collected by them upon his own stocks, and with deposits made by him. They from time to time rendered to him an account of such collections and deposits, and of their disbursements, in which accounts the sources from which dividends were received were stated, so that it appeared what came from the trust stocks and what from other sources.

Mr. Boardman was in the habit of keeping a memorandum book or journal in which he entered many of his financial transactions, and also a book called a ledger, in which entries were made or posted from the journal. On the journal and in the ledger he made, from time to time, entries showing a portion of the dividends collected by Whitehouse & Co., by whatever name the firm was at different times known, in which entries he was accustomed to designate the dividends upon the trust stocks by the addition of "C. E. B.," "C. E. B., trustee," or "C. E. B., trustee for L. H. B.," to distinguish the same from the dividends upon his own stocks. His habit was uniform in this respect, with the exception of one instance in which the omission was evidently accidental. The date and amount of the several dividends appear correctly in the claim therefor filed by the appellee.

In August, 1860, Mr. Boardman purchased through Whitehouse & Co., for and on account of the trust, fifty shares of the Continental Bank of the City of New York, at a cost of $5,138.76, and gave them credit by an entry on his journal for the purchase, "acc. C. E. B., trustee," and also by an entry on his ledger charged them with the same amount,

"Divds. acc. C. E. B., trustee." These fifty shares of stock were transferred by Whitehouse & Co. to C. E. Boardman, trustee, August 27th, 1860. The dividends upon the trust stocks up to that time exceeded the amount of the purchase. The investment was made in consequence and on account of the dividends received from the trust stocks and as a partial investment thereof for the use and benefit of his wife.

The Delaware & Hudson Canal Company, in addition to the cash dividends paid by them, from time to time made such stock dividends that C. E. Boardman, trustee, as the legal owner of two hundred shares of the stock, became entitled to, and there were issued to her in trust, August 1st, 1864, thirty-three shares; January 12th, 1865, thirty-three shares; and June 1st, 1868, one hundred and thirty-three shares. This last dividend was subject to a payment of $60 upon each share, which sum, amounting to $7,980, was paid by Whitehouse & Co. by direction of Mr. Boardman out of his funds in their hands, and the stock was issued to the trustee with his knowledge. The value of the stock when issued was above its par value of $100 per share. The dividends received by Mr. Boardman from the trust stocks, at the time of the payment by him on account of these hundred and thirty-three shares, exceeded the amount so paid.

On the one hundred and twenty shares of stock in the Bank of New York, held by the trustee, such distribution was made of certain shares, owned by the bank at the time of its becoming a National Bank, that fifteen of these shares were distributed to the trustee on payment in cash of its par value of $100 per share, its market value being fifteen or twenty per cent. above par. This payment was also made by Whitehouse & Co., by direction of Mr. Boardman, and the fifteen shares were issued to the trustee with his knowledge. The dividends received by him at this time from the trust stocks were greater in amount than the sum so paid.

On the 31st of January, 1870, Mr. Boardman procured from the trustee powers of attorney to convey the hundred and ninety-nine shares of stock of the Delaware & Hudson Canal Company, the fifteen shares of stock in the Bank of

New York, and the fifty shares of stock in the Continental Bank. Acting under these powers of attorney, he, on the 14th of February, 1870, transferred to his own name on the books of the Delaware & Hudson Canal Company one hundred and ninety-nine shares of the stock of that company standing in the name of the trustee, and on the 11th of April, 1870, transferred to himself fifteen shares of stock of the Bank of New York, and on the 14th of February, 1870, fifty shares of stock in the Continental Bank, all standing in the name of Cornelia E. Boardman, trustee.

In the latter part of January, 1870, Mr. Boardman wrote a letter to the trustee, asking her for the certificate for the hundred and ninety-nine shares, and the fifteen shares, with power to transfer the same, and stating that the two hundred shares of Delaware & Hudson stock should remain in her name, and the hundred and twenty shares of the Bank of New York, and that the surplus he wished to transfer to his own name "to avoid possible trouble." At the time he applied for and obtained the powers of attorney and transferred these stocks he intended thereby to convert the same to his own use, so that neither the stocks nor the dividends received by him upon the original trust stocks should go to the use and benefit of his wife, but should belong to and form part of his estate.

Mr. Boardman never kept any account upon his books above referred to, either with the trustee or with his wife, of the income derived from the trust fund, or of the investment thereof, but the income from the fund was indicated, as before stated, in his entries in his account with his bankers. He kept a regular account with Cornelia E. Boardman of all money received or paid by him on her individual account.

In the year 1863 he commenced to collect for his wife, and invest the income derived from her own estate, and after that time until his death he kept a regular account with her of the receipts and disbursements of such funds.

At all times after his marriage his income from his own estate, independent of the trust estate, was larger than his expenses, and his estate rapidly accumulated. The dividends

received by him from the trust estate went into his private account with his bankers, and formed in part the funds upon which he drew checks for various purposes for which he had occasion. His expenses were not at all influenced or increased on account of the receipt of the income from the trust estate, and he expended for his wife, or for her gratification and enjoyment, no more than he would have expended if he had not received that income, and no more than his duty reasonably required. He expended all that was necessary for the happiness and comfort of himself and wife as they wished to live, and their views were in harmony in regard to their style of living.

He usually had a considerable balance to his credit with his bankers, upon which they allowed interest at six per cent., and his estate has been increased by his receipt of the dividends, an amount equal to the aggregate of the dividends and interest thereon, if the fifty shares of Continental Bank stock, the hundred and ninety-nine shares of Delaware & Hudson Canal Company stock, and the fifteen shares of stock of the Bank of New York, go into and form part of his estate.

After the marriage Mrs. Boardman knew that the trustee gave orders to her husband to collect the dividends on her stocks held in trust. On some occasions Mr. Boardman sent by his wife orders for the trustee to sign, saying they are orders for " your dividends." No arrangement or understanding of any kind existed between them at the beginning as to the appropriation of these dividends. Mrs. Boardman had a general impression, from the tenor of the ante-nuptial contract, that these dividends were to be invested and accumulate for her benefit, and form an estate for her after her husband's death. She was not much acquainted with business affairs, and had perfect faith in the good judgment and great caution of her husband, and supposed that what he did in the matter would be for her best interest, and never in fact thought or troubled herself much about the matter. Her wants were always generously and liberally supplied by him, and she had no occasion to call for this income for any present

needs.   There was never any conversation between Mr. Board-
man and his wife directly relating to these dividends.   He
never informed her of the amount of dividends received, nor
of the disposition that he had made of them.   He never
informed her of the investment in the Continental Bank, nor
of the stock dividends made by the Delaware & Hudson
Canal Company, nor of the distribution of fifteen shares on
the hundred and twenty shares of stock in the Bank of New
York, nor of his intention to transfer to himself the several
stocks, nor of the fact that he had so transferred them, and
she had no knowledge in relation to any of these several mat-
ters until after his death.   He was not in the habit of talking
with her in relation to his business transactions or invest-
ments, and she, from motives of delicacy, never questioned
him in relation to matters which he seemed to prefer not to
make the subject of conversation.

The trustee never communicated to Mrs. Boardman any-
thing in relation to their various transactions, and she never
made any inquiries of the trustee in relation thereto.   The
relation of the parties was friendly, and they visited each
other several times a year.   The trustee never questioned the
right of her brother to make the disposition which he pro-
posed to make of the stocks, and never informed Mrs. Board-
man of such disposition.

Some time between May, 1860, and May, 1861, Mr. Board-
man had a negotiation with Mr. Atwater of New Haven for
the purchase of a block of buildings in Orange street.   At
or about this time he informed his wife that he was about to
make a purchase of a block of buildings with some of her
dividends.   She asked him where, and he informed her.   A
few days after he informed her that Atwater had backed out.
The dividends received by him at this time were from nine
to ten thousand dollars.   The price asked for the block was
twenty thousand dollars.   On one occasion and not far from
the time of the previous conversation, in speaking of the
Southern States, and the probability of their repudiating their
bonds, he said to her, "Now you will be glad you have none
of those Mobile bonds."   She understood these casual remarks

in reference to her dividends and investments, as implying that he was in some way investing them for her benefit.

Mrs. Boardman never intended to relinquish her legal rights under the ante-nuptial contract, and never supposed she had done so, and had full faith that her husband would do what was right and proper in the premises. She had no knowledge of the provisions of his will until about two weeks before his death, when being informed by his physician that he would not probably recover, he proposed to have his will sent for, in order to make some additional bequest for certain public benevolent purposes, and in such conversation informed his wife of the provision made for her. He asked her if she was satisfied, to which she replied that she was quite satisfied, and consulted with him as to the kind of investments she should select out of his estate. He told her that he had made this provision for her for life, as her brother and sister did not need it. He told her she would have income enough to keep up the mansion house and grounds. Nothing was said by either in relation to the income from the trust fund. He became worse during the day, and his will was not sent for, and it remained unchanged.

After Mr. Boardman began to collect his wife's income from her own estate in 1863, he kept an account of the dividends received and investments made, and of money paid to her on account of such income. She occasionally desired to give from her own money for religious and charitable purposes, and to make donations to some persons who had claims upon her, and such sums were charged to her in the account, and the balance was invested according to the judgment of her husband. He frequently informed her of the state of this account, and of the investments made by him, and on one or two occasions gave to her a statement of the account and of the investments. This fund amounted to about $15,000 at the time of his death.

When Mr. Boardman made his last will, and from that time to the time of his death, he supposed and expected that no claim would be made upon his estate for the dividends received by him from the trust estate, nor for the surplus

stocks which he had recently transferred to himself. This fact the committee found inferentially from the other facts found.

Mrs. Boardman supposed and believed that the income belonged to her. She had never been asked to relinquish or give up any rights under the ante-nuptial contract, and she never in fact relinquished any of her legal rights under the contract, whatever they were, unless such relinquishment and abandonment are to be legally inferred and implied from the facts here found, and her acceptance of the provisions for her in the will.

The annual income from the trust estate is about $4,200, from the legacy of $200,000 about $14,000, and from her individual estate from $1,200 to $1,500. Her annual expenses are about $5,000, and about the same as those of Mr. Boardman during his life.

During the two weeks succeeding her husband's death Mrs. Boardman inquired after, and received from her co-executor, the bonds and certificates in which her own estate was invested, and the accrued income due to her thereon. She had a knowledge of these investments from her husband. She made no inquiry after any investments of the dividends from the stocks held in trust, until about two weeks after the death of Mr. Boardman. About that time the question of her right to those dividends began to be agitated. She then first became aware of the Delaware & Hudson stock dividends, and it was then supposed that they stood in the name of the trustee, but it was subsequently ascertained that they had been transferred.

The fifty shares of Continental Bank stock, and the fifteen shares of stock of the Bank of New York, were inventoried and have been distributed as part of the estate of Mr. Boardman. At the time of the inventory and distribution thereof Mrs. Boardman did not know any of the facts hereinbefore stated in regard to these two parcels of stocks.

The dividends received by Mr. Boardman on Delaware & Hudson Canal stock in August, 1870, February, 1871, and August, 1871, were $1,995 each, instead of $1,000 each, as

charged by the appellee in her account, being five per cent. dividends on three hundred and ninety-nine shares of stock. By inadvertence she omitted to charge in her account that portion of each of these dividends which belonged to the hundred and ninety nine shares that Mr. Boardman had transferred to himself. The principles upon which her account is made up, if sound, would have justified her in charging each of the dividends at $1,995, and but for inadvertence they would have been so charged.

The inventory of Mr. Boardman's estate, as presented to and accepted by the court of probate, amounts to $1,110,190.05, classified as follows: personal estate, $619,758.05; furniture, etc., 5,000; real estate, 485,432. The dividends received by Mr. Boardman from the trust estate, and charged in the account of the appellee with interest from the time they were severally received to the 20th day of April, 1872, amount to $91,952.08. The amount with the claimed corrections above stated with interest to the same date, is $95,159.97. The amount with interest to the same date, deducting dividends on increased stock, is $81,911.50. The amount, allowing dividends on the increased stock and deducting the dividends on the proportion of increased stock paid for by Mr. Boardman, with interest to the same date, is $86,487.40.

Upon these facts the case was reserved by the Superior Court for the advice of this court.

*J. S. Beach* and *Doolittle*, for the appellant.

*First.* The statute, (Gen. Statutes, tit. 13, sec. 20,) regulates the correlative rights of husband and wife to the personal estate of the wife. The husband has the income while he lives, and the wife has the principal when he dies. And when the statute says (§ 20,) that " the husband shall be entitled to the rents and profits of such estate during his life," it means, (§ 19,) " all the personal property of any married woman." In this case Mrs. Boardman, by the ante-nuptial contract, had the right to receive the income from the stocks therein mentioned, and the right

to dispose of the stocks at her decease. These rights she possessed at her marriage, and this right to the income at the time of the marriage vested in her husband during his life by force of the statute. These rights constituted property and estate in these stocks, and it is of no consequence how she acquired them. But if we are incorrect in this view in relation to the dividends, then we say that Mr. Boardman was clearly entitled to the income derived from the dividends by force of the statute, and therefore is not liable to a charge of interest. If Mrs. Boardman had received these dividends and invested them in bank stock in her own name, Mr. Boardman would be entitled to the dividends accruing thereon. Upon any theory of the case Mr. Boardman's estate cannot be held accountable for the profits accruing from the dividends. *Carne* v. *Brice*, 7 Mees. & Wels., 183 ; *Tugman* v. *Hopkins*, 4 Man. & Grang., 389.

*Second.* As Mr. Boardman was permitted to receive the income of the stocks during his life, with the knowledge of Mrs. Boardman and without objection, the law implies her assent, and at his death this income belonged to his estate.

1. The facts found by the committee show an actual intention to permit him to appropriate the income. The record discloses that this ante-nuptial settlement was made to guard against a contingency affecting his estate which Mr. Boardman anticipated might happen. It was prudent that such a provision should be made. The settlement, therefore, was prepared by Mr. Boardman with this view and to effect this object; and it contemplated a further provision for Mrs. Boardman in his last will. Mrs. Boardman, understanding perfectly well his object in making this instrument, lent her aid so far as she could to accomplish this purpose, and exercised her power of appointment in favor of his sister, Cornelia, well aware that in the event of the anticipated contingency she would pay the income to her brother. His conduct was also in harmony with this purpose. In August, 1860, he purchased fifty shares of Continental Bank stock, in the name of his sister as trustee, which was soon after the marriage, and before the danger had ceased to exist. He

VOL. XL.—24

made no further investments in the name of the trustee, as
his apprehensions were soon after removed.   During all his
life he received these dividends and treated them as his own,
and in precisely the same manner as the other dividends that
he received from time to time from stocks standing in his own
name.   Nothing is to be gathered from the fact that on one or
two occasions he spoke casually of them to his wife as "your
dividends," as that expression would naturally be used in the
same manner to indicate origin and not ownership by a
husband who had made no contract with his wife, but who
collected and used as his own the dividends of her stocks,
which would unquestionably belong to him under the statute.
As the record states, "Mr. Boardman never kept any account
upon his books, either with the trustee or his wife, of the
income derived from the trust fund, or of the investment
thereof," but it appears that he kept an accurate account of
every cent that he received from Mrs. Boardman's separate
property, and invested it for Mrs. Boardman in her name,
and from time to time furnished her at her request statements
of the same, and she had frequent consultations with him
as to the investments of her income from her property.   She
never made the slightest inquiry of him in reference to the
income from these stocks, nor did he ever give her the
slightest information in regard to them, although he freely
conversed with her as to her own property and its condition;
and after his death, while she carefully inquired after and
received from her co-executor the bonds and certificates in
which her own estate was invested, and the balance due
her at that time, she made no inquiry as to the income
derived from the trust-stocks or its investment.   Mr. Board-
man, acting in perfect good faith, when informed that he
might not recover from his illness, informed his wife with
entire accuracy of the provisions that he had made for her,
giving her the use of the homestead, worth $100,000, and
all that the house and its surroundings contained, and the
use of other property yielding an annual income of $18,200,
more than three times as much as she can expend for her own
comfort, in addition to which she has the income of her sep-

arate estate.   She expressed her entire satisfaction with this provision, and must be regarded as having accepted it with the understanding that she had fully relinquished to him all her right to the dividends received by him.

2.   The committee has found that Mrs. Boardman has made no formal relinquishment of her rights under the contract, and has left the question open to be determined whether the law infers a relinquishment from her conduct.   The rule is well stated in 2 Swift Dig., 143, as follows: "As to the accountability of the husband for the separate estate of the wife, it is a rule that the husband is not to account for the income of the wife's separate estate which she permits him to receive.   Where the wife suffers the husband to take the avails, or consents that they shall be laid out in providing for the family, it will be a gift to the husband."   *Smith* v. *Camelford*, 2 Vesey, 698, 716; *Squire* v. *Dean*, 4 Brown Ch., 326; *Beresford* v. *Archbishop of Armagh*, 13 Sim., 643; *Bartlett* v. *Gillard*, 3 Russ., 149; *Powell* v. *Hankey*, 2 P. Wms., 82; *Thomas* v. *Bennett*, id., 341; *Carter* v. *Anderson*, 3 Sim., 370; *Dalbiac* v. *Dalbiac*, 16 Ves., 126; *Thrupp* v. *Harman*, 3 Mylne & Keen, 513; *Caton* v. *Rideout*, 1 Mac. & Gor., 599; *Rideout* v. *Lewis*, 1 Atk., 269; *Rowley* v. *Unwin*, 2 Kay & J., 142; *Arthur* v. *Arthur*, 11 Irish Eq., 513; *McGlinsey's Appeal*, 14 Serg. & R., 64; Perry on Trusts, § 665; *Corbally* v. *Granger*, 4 Irish Ch., 173; *Moore's Exr.* v. *Ferguson*, 2 Mumf., 421; *Dunn* v. *Sargent*, 101 Mass., 336; *Towns* v. *Hagner*, 3 Whart., 57; *Roach* v. *Bennett*, 24 Missis., 104.

3.   Mrs. Boardman must be regarded as estopped in equity from making the claim.   She permitted Mr. Boardman during their entire married life to receive and enjoy the dividends, without objection from her, or an intimation that she had any claim to them, or an inquiry even in relation to them, and he believing that they were his and formed a part of his estate made his will, and acting upon this belief made a disposition of his estate, relying upon her assurance that it was satisfactory to her.   It is therefore just and equitable that she should be estopped from now asserting a claim to this property, especially when his title is based upon her silence

and acquiescence in his acts and conduct in reference to the same while in full life. If both these parties had died simultaneously, as Mr. Boardman had received these dividends all his life, the courts would have acted upon the presumption that it was with her acquiescence and denied any claim of her representatives. *Smith* v. *Chapell*, 31 Conn., 594.

*Third.* A large part of the claim is barred by the statute of limitations. If at the time Mr. Boardman received these dividends they were her separate estate, then Mrs. Boardman was under no disability to bring her bill in equity by her next friend, to compel him to pay over the income to her. 2 Kent Com., 164 ; Reeve Dom. Rel., 173 ; 2 Story Eq. Jur., § 1368. The cause of action accrued to her at the time of each reception of a dividend ; therefore no claim can be made for any dividend, except those which he received during the last six years of their married life. *Hart's Appeal from Probate*, 32 Conn., 539 ; *Wilmerding* v. *Russ*, 33 id., 76. When Mr. Boardman received these dividends, if he was a trustee at all, he was a trustee by implication, and implied trusts are within the statute. *Wilmerding* v. *Russ*, supra. If to avoid this result it is claimed that Mr. Boardman was a statutory trustee, and that under the statute his trust terminated at his death, and then the title vested in his wife, then we say that Mr. Boardman was entitled to the interest and profits of the dividends by force of the same statute.

*Fourth.* By the terms of the contract Mrs. Boardman did not take a separate estate in the trust property. It may be remarked *in limine,* " that in our state, arrangements by which the wife shall have separate and independent interests in property during coverture, are not favored." *West* v. *Howard*, 20 Conn., 587. The manifest object of this instrument was to save something for his wife to live upon after his death, if his property should be swept away by the persons affected by the fraud of Mr. Schuyler, and if this event did not happen, then it contemplated a further provision by his will. This fund, immediately upon the marriage, became subject to the operation of the Connecticut statute, as her domicil was changed to that of her husband by the marriage.

*Mason* v. *Fuller*, 36 Conn., 160. In the construction of this contract the court will regard the situation of the parties at the time the contract was made, and the object in view, and will so construe the contract as to carry out that intention. *Baldwin* v. *Carter*, 17 Conn., 201. Mr. Boardman when he drew this contract was dealing with two different classes of property, the trust fund, which he had created from his own property, and the property which belonged to his wife, and he uses very different language in the two cases. When he treats of his property vested in the trustee, he gives it to "her sole use and benefit for life;" and when he treats of her individual property, he says, "shall be and remain hers to her own sole and separate use and disposition to all intents and purposes;" and as he did not use the technical words to create a separate estate when treating of his property, and did use the proper technical words to create a separate estate when treating of her property, it clearly shows that he recognized the distinction between property given to his wife and property conveyed to her separate use. In one case he could exercise his marital rights, and in the other not. "The intention to give a separate estate must be clearly expressed. A gift to a wife for her own use and benefit does not clearly express such an intention, especially when it is considered that a trust for the separate use of a married woman is clearly expressed in the preceding part of the settlement. The court cannot infer that the same effect was intended to be given to different expressions." *Kensington* v. *Dollond*, 2 Mylne & Keen, 184. See also *Lumb* v. *Milnes*, 5 Vesey, 517; *Wills* v. *Sayers*, 4 Madd., 408; *Tyler* v. *Lake*, 2 Rus. & Myl., 183; *Lewis* v. *Matthews*, Law Reps., 2 Eq. Cas., 178; *Barrett* v. *Barrett*, 4 Dessaus., 448; *Roberts* v. *Spicer*, 5 Madd., 491; *Massey* v. *Parker*, 2 Mylne & Keen, 174; *Backlow* v. *Laws*, 2 Hare, 40; *Rycroft* v. *Christy*, 3 Beav., 238; *Massey* v. *Rowen*, Law Reps., 4 Eng. & Irish App. Cas , 238; *Gilbert* v. *Lewis*, 1 De G., J. & S., 38; *Wade* v. *Fisher*, 9 Rich. Eq., 362; *Wilson* v. *Bailer*, 3 Strobh. Eq., 258.

*Fifth.* Under the last will of Mr. Boardman, his wife, in addition to other devises and bequests in her favor, received a legacy of the income of two hundred thousand dollars during her life, to be taken from such parts of her husband's estate as she should select, at the appraisal in the inventory. The residue of the estate is given to certain residuary devisees and legatees therein named. It is found that he did not intend that the dividends received by him upon the trust estate should go to the use and benefit of his wife, but intended they should belong to and form part of his estate; also that when he made his will, and from that time to the time of his death, he supposed that no claim would be made by his wife upon his estate for the dividends received by him from the trust estate. His wife having accepted the devises and bequests in her favor under the will, and selected her securities to the amount of $200,000 at inventory price, now represents to the court that she has certain *other* securities in her hands " belonging to said estate and inventoried as part thereof," consisting of bonds of the par value of $118,000, and prays the court to authorize her to sell these bonds, and to pay the avails to herself in liquidation of a claim which she brings against the estate. It is apparent upon the record that these bonds were intended by the testator, not for her, but for his residuary legatees. The court will not sanction her effort to appropriate to herself these bonds that the testator has given to the residuary legatees by his will, and at the same time permit her to retain the benefits conferred upon her under the same instrument. She must be put to her election. *Smith* v. *Smith,* 14 Gray, 533; *Hyde* v. *Baldwin,* 17 Pick., 308; *Havens* v. *Sacket,* 15 N. York, 369; *Brown* v. *Pitney,* 39 Ill., 470; *Williams* v. *Gray,* 1 Coldw., 104; 2 Story Eq. Jur., § 1075; 2 Redfield on Wills, ch. 14, sec. 6. We insist that the testator by his will does give these bonds, which may be considered as representing the collected dividends, to his residuary legatees. " It is a well settled rule of construction in respect of wills, that a court may place itself in the condition of the testator in respect to his property and the situation of his family." *Bond's Appeal from*

*Probate,* 31 Conn., 190; *Spencer* v. *Higgins,* 22 id., 521; *Birmingham* v. *Kirwan,* 2 Sch. & Lefr., 449; *In re Ruding's settlement,* Law Reps., 14 Eq. Cas., 266, 271. This rule of construction applies to wills involving questions of election equally as to other wills. " As an election depends upon the purpose of the testator, and whether he intended the devisee, upon accepting the provisions of the will, to acquiesce in all the other provisions of the instrument, it has often been made a question how far parol evidence was admissible to show such intention. It is undeniable that parol evidence is receivable to the same extent as in other cases, in aid of the construction of written instruments, that is, to show the condition of the subject matter, and the surrounding circumstances, so far as to place the court in the position of the testator. But the intent must appear by the words of the will, with the aid of allowable construction, or it cannot be regarded in determining the question of election." 2 Redfield on Wills, ch. 14, sec. 6, § 15. And this is now the rule of the English courts. *Wintour* v. *Clifton,* 8 De G., M. & G., 647. The court having by its committee put itself in the place of the testator and inquired into his surroundings, finds that " when Mr. Boardman made his last will, and from that time to the time of his death, he supposed and expected that no claim would be made upon his estate for the dividends received by him from the trust estate." The intent that his wife should not have these dividends, involves as a necessary corrollary his intent that his residuary legatees should have them. Having by legitimate means possessed ourselves of the actual intent of the testator, there remains the question whether the testator has so expressed that intent upon the face of the will that the court can, consistently with established principles of law, carry it into effect. Upon this point we find that the testator in his will not only makes all necessary and most ample provision for his wife, but that, in a clause by itself, he states his object in making so ample provision for her to be to secure her " comfort and support." This necessarily implies that but for the provision made for her by his will she would not in his opinion have had the means of " comfort and support."

He might have given her a liberal bequest, but he would not have used that language in giving it. But it is said that the doctrine of election is not applicable to the case of a creditor on the one hand, nor, on the other, to one where the property to be relinquished on taking a legacy is given only by a residuary bequest. To these objections we reply, 1st, that Mrs. Boardman is not a creditor in the sense in which that term is used in the cases sustaining that proposition. Her claim originates under a marriage settlement, which, by its terms, contemplated, a further provision for her by will. This further provision was made upon the assumption that the principal of the trust fund belonged to her under the settlement, and that the collected dividends belonged to him and formed part of his estate. The two instruments were from their origin regarded by the testator as complementary one of the other, and in the language of his will, "my intention *was and is* to make abundant provision, &c.," as constituting together an ample provision for the support and comfort of his wife. *Wathren* v. *Smith*, 4 Madd., 325; *Garthshore* v. *Chalie*, 10 Vesey, 1; *Dawson* v. *Dawson*, Law Reps., 4 Eq. Cas., 504, 513. But even if we assume that she is technically entitled to the appellation of creditor, she cannot invoke the aid of the rule relied upon in her behalf. The principle upon which a creditor who receives a benefit under the will is not put to his election, but may have both his debt and his legacy, is, as stated in all the cases cited by the appellee upon this point, that of carrying out the intention of the testator, the court properly assuming that it was the intention of the testator to pay the debts of his recognized creditors. But no case can be found denying the necessity of election to a creditor receiving a benefit under a will, and, at the same time, pressing a claim the testator repudiates. *Fox* v. *Fox*, Law Reps., 11 Eq. Cas., 142; *Coutts* v. *Ackworth*, 9 id., 519. Clearly if Mr. Boardman had by his will in terms declared his intention that his wife should not be allowed this claim, she would be put to her election, and yet it would be equally the case of a creditor, and the only difference would be that the fact, clearly established in both cases, in one is

expressed unmistakably by the will and in the other is gathered from implication and enquiry. 2d. We say that it is no objection that the question arises under a residuary clause of the will. This is shown by the case of *Blommart* v. *Player*, 2 Sim. & Stu., 597, a case directly in point. To the same effect are *Cooper* v. *Cooper*, Law Reps., 6 Cha. Appeals, 15, and *Wintour* v. *Clifton*, 8 DeG. M. & G., 647. The intent of the testator that these dividends should go to the residuary legatees and not to the wife being fully ascertained, is there any principle of law which forbids the court carrying out that intent? None is pretended. The words of the will are as apt to convey them to the residuary legatees as if they had been the subject of a specific bequest. If they are not conveyed, it will not be for the want of intent of the testator to convey them, nor for lack of apt words in the will to fulfill that intent, but because Mrs. Boardman shall elect to claim them as her own property. This she may do, but if she thus defeats her husband's intent she must resign all benefits under the will.

*Ingersoll* and *H. B. Harrison*, for the appellee, cited, as to ante-nuptial contracts being favored in equity—*Andrews* v. *Andrews*, 8 Conn., 85; *Selleck* v. *Selleck*, ib. note; *Brown* v. *Slater*, 16 id., 192, 198; *Baldwin* v. *Carter*, 17 id., 201, 206, 209; *Imlay* v. *Huntington*, 20 id., 148, 173; *West* v. *Howard*, id., 587; *Riley* v. *Riley*, 25 id., 154, 158; *Deming* v. *Williams*, 26 id., 226. As to the facts not constituting a gift of the dividends by Mrs. Boardman to her husband—*Beresford* v. *Archbishop of Armagh*, 13 Simons, 643; *Darkin* v. *Darkin*, 17 Beav., 578; *Moore's Exr.* v. *Ferguson*, 2 Munf., 421, and note; *McClinsey's Appeal*, 14 Serg. & R., 64; Schouler Dom. Rel., § 226; *Kline* v. *Kline*, 57 Penn. S. R., 120; *Bergey's Appeal*, 60 id., 408, 415. As to courts of equity requiring clear proof in such cases of an intention to make the gift— *Jarvis* v. *Prentice*, 19 Conn., 284; *Imlay* v. *Huntington*, 20 id., 165; *Jennings* v. *Davis*, 31 id., 138; 2 Story Eq. Jur., §§ 1375, 1395. As to the rule of equity with regard to "pin money" not being applicable to the case—Adams Eq.,

46; *Aston* v. *Aston*, 1 Ves. Sen., 267; *Digby* v. *Howard*, 4 Simons, 588; *Howard* v. *Digby*, 8 Bligh, 224. As to courts of equity protecting with special care the separate property of a wife against her husband—*Picquet* v. *Swan*, 4 Mason, 454; *Buchanan* v. *Deshon*, 1 Har. & Gill, 292; *Walker* v. *Walker*, 9 Wall., 743; *Grabill* v. *Moyer*, 45 Penn. S. R., 530; *Bergey's Appeal*, 60 id., 408; *Bartlett* v. *Gillard*, 3 Russ., 149. As to the equitable doctrine of election having no application to the case—Willard's Eq., ch. 7, § 11; White & Tudor's Lead. Cas. in Eq., note to *Streatfield* v. *Streatfield*, p. 225; id., 235; *Thellusson* v. *Woodforth*, 13 Ves., 219. As to the inadmissibility of all proof outside of the will, as to the husband's understanding and intention with regard to his wife's making the present claim,—*Dummer* v. *Pitcher*, 2 Mylne & Keen, 262; *Stratton* v. *Best*, 1 Ves. Jr., 285; *Clemenston* v. *Gandy*, 1 Keen, 309; *Birmingham* v. *Kirwan*, 2 Sch. & Lefr., 451; 8 Viner Abr., 366; *French* v. *Davies*, 2 Ves. Jr., 572; *Ellis* v. *Lewis*, 3 Hare, 310; *Melchor* v. *Berger*, 1 Dev. & Batt. Eq., 634; *City of Philadelphia* v. *Davis*, 1 Whart., 490; *Havens* v. *Havens*, 1 Sandf., 324; *Whilden* v. *Whilden*, 2 Riley Ch., 205; *Bull* v. *Church*, 5 Hill, 206; *Sandford* v. *Jackson*, 10 Paige, 269, 274; *Kearney* v. *Macomb*, 16 N. Jer. Eq., 189; *Tongue's Lessee* v. *Nutwell*, 17 Maryl., 212; *Jones* v. *Jones*, 8 Gill, 197; *Havens* v. *Sackett*, 15 N. York, 365; *Box* v. *Barrett*, Law Reps., 3 Eq. Cas., 244; *Blake* v. *Bunbury*, 1 Ves. Jr., 523; *Adsit* v. *Adsit*, 2 Johns. Ch., 448, 451. As to the equitable doctrine of "satisfaction" by the legacies, not being applicable to the case—*Strong* v. *Williams*, 12 Mass., 391; 2 Redfield on Wills, ch. 13, sec. 10; 2 White & Tudor's Lead. Cas. in Eq., 295, 301; *Smith* v. *Marshall*, 1 Root, 159; *Williams* v. *Crary*, 4 Wend., 443; *Byrne* v. *Byrne*, 3 Serg. & R., 54; *Rickets* v. *Livingston*, 2 Johns. Ch., 97; *Jeffreys* v. *Mitchell*, 20 Beav., 15; *Cole* v. *Willard*, 25 id., 568; *Pinchin* v. *Simons*, 30 id., 119; *Glover* v. *Hartup*, 34 id., 74; *Gee* v. *Liddel*, 35 id., 627; *Richardson* v. *Elvinstone*, 2 Ves. Jr., 463; *Atkinson* v. *Webb*, 2 Vern., 478; *Cuthbert* v. *Peacock*, 1 Salk., 155; *Chancy's case*, 1 P. Wms., 408; *Richardson* v. *Greese*, 3 Atk.,

65; *Clark* v. *Sewell*, id., 96; *Cranmer's case*, 2 Salk., 508. And as to the propriety of interest being allowed on the dividends received by Mr. Boardman—Willard's Eq., ch. 7, sec. 17; *Walker* v. *Walker*, 9 Wall., 743; *Williams* v. *Powell*, 10 Eng. Law & Eq., 225; *Fay* v. *Howe*, 1 Pick., 527.

FOSTER, J. This claim of Mrs. Boardman against the estate of her deceased husband grows out of an ante-nuptial contract entered into by them on the 24th of July, 1857, a few days before their intermarriage. The construction of that contract is of course directly involved; and in connection with it we shall doubtless find it necessary to examine the last will of Mr. Boardman, as that contains devises and bequests for the benefit of his widow.

The parties were married on the 28th of July, 1857. He was then sixty-four, and she thirty-eight years of age. He had an estate of nearly or quite half a million of dollars; and she a patrimony of about six thousand dollars. He died on the 27th of August, 1871, and his will bears date on the 19th of March, 1870. The inventory of his estate is $1,110,-190.05.

By the ante-nuptial contract above referred to Mr. Boardman conveyed to a trustee two hundred shares of stock in the Delaware & Hudson Canal Company, one hundred and twenty shares of stock in the Bank of New York, and one hundred shares of stock in the Market Bank of the city of New York, to be held in trust, in the words of the instrument, " for the sole use and benefit of said Lucy [afterwards Mrs. Boardman] during her life; and after her decease, to be subject to such disposition as the said Lucy, by will, or by any proper appointment in writing, may direct." The agreement then proceeds as follows : " It is further agreed and settled that the property and estate now appertaining and belonging to the said Lucy shall be and remain hers, to her own sole and separate use and disposition, to all intents and purposes. It is also further understood and agreed, in consideration of the premises, that in the event of the demise of the said William, leaving the said Lucy surviving, she will not claim or receive any dower in the real estate of the said

William, wherever situated, nor any distributory share in his personal property, except as the same may be devised or bequeathed to her in the last will and testament of the said William; the provision in this marriage settlement being intended and accepted in lieu and in full of dower, and of widow's statutory rights, in both the real and personal property of the said William W. Boardman."

The dividends on these shares of stock in these several corporations, accruing after the date of this contract, were received by Mr. Boardman up to the time of his death, when they amounted, with interest, to between eighty and ninety thousand dollars. Whether or not his estate shall be held liable to pay these dividends to Mrs. Boardman, is the question to be decided.

The case has been very ably, indeed exhaustively, argued. If the first claim on the part of the appellant be well founded, the question is shortly disposed of. That claim is, that the right to the income from these stocks being in Mrs. Boardman at the time of the marriage, that right thereupon became vested in her husband, during his life, by force of the statute; that his right to these dividends was absolute and no valid claim for them can exist against his estate.

We must dissent altogether from this proposition. The language of this contract is clear and explicit. Its object and intent are too apparent to be mistaken; and the committee finds that it was executed, " as and for a valid and binding agreement upon the parties, for the uses and purposes therein mentioned." Out of Mr. Boardman's very ample estate he carved this comparatively small portion, and conveyed it to a trustee to be held for the sole use and benefit of her who was to become his wife, during her life; giving her the power of disposing of the same by will, or by any proper appointment in writing. This was received and accepted in lieu of dower, and in full discharge of all claims to any distributory share in his estate, should she survive him; which, in the ordinary course of nature, was certainly to be expected.

We can have no doubt but that the income of this property

belonged to Mrs. Boardman as her sole and separate estate. Such is the reading of the contract, which does not require, and scarcely admits of construction. Bell on the Law of Property of Husband and Wife, 473, 475. The situation of the parties and the subject matter of the transaction may very properly be brought into view to aid in determining the legal effect of a contract. Having abundant means, which were rapidly increasing, Mr. Boardman was no doubt desirous of making adequate provision for his wife in the event of his death, and at the same time of leaving his estate unincumbered by any claims for dower. So he was induced to make this settlement. Mrs. Boardman, in accepting it, even with its probable accumulations, was manifestly giving up a large portion of what the law, in the event of his death, she surviving, would pronounce hers. In the case of *Deming* v. *Williams*, 26 Conn., 226, this court recognized a distinction between a gift or a conveyance to a wife by a stranger and by a husband. Words of exclusiveness are necessary in the case of a stranger; otherwise, the unity of husband and wife would carry to the husband alone a gift of personal property made to the wife; but when the husband himself makes the conveyance, the wife takes a sole and separate estate without express words to that effect. As the parties contemplated immediate marriage, this settlement should be construed in light of this principle. The case of *Massey* v. *Rowen*, Law Reps., 4 Eng. & Irish Ap. Cas., 288, one of the most recent cases, perhaps the most recent decided in the House of Lords, where the doctrine of separate estates was very fully investigated, holds that the word " sole " has not a fixed, technical meaning in a will; but that it may have in a marriage settlement. The doctrine of this case strongly supports, as we think, the construction which gives Mrs. Boardman a separate estate under this contract. To claim that, by virtue of his rights as her husband, Mr. Boardman was entitled to the dividends on these stocks, is to do violence to the language of this contract, and to defeat the very object which the parties designed to accomplish. We hold that these dividends were the sole and separate property

of Mrs. Boardman, and being hers by an ante-nuptial contract, they continued hers after marriage, precisely as if she had remained a femme sole. *Imlay.* v. *Huntington*, 20 Conn., 146; *West* v. *Howard*, id., 587. To hold, as we must, that by the terms of this settlement this widow is barred of her dower in this large estate, and then not permit her to call her own the income of the fund expressly secured to her and accepted by her in substitution, would be, indeed, the grossest injustice. As Lord Hardwicke pithily asked in *Tyrrell* v. *Hope*, 2 Atk., 558, we would ask here, " to what end should she receive it, if it is the property of her husband the next moment?"

The record shows that, from time to time, after the marriage, Mr. Boardman procured orders from the trustee of this property, who was his sister, and collected the dividends declared, as they fell due, through his bankers in New York, who placed them to his credit, with other funds of his on deposit with them. That Mr. Boardman was accountable for these dividends during his life, and that his estate became chargeable after his death, payment over not having been previously made, is a necessary result of what we have already said, and must, indeed, be considered as settled on well established principles. *Walker* v. *Walker*, 9 Wallace, 743.

It is insisted however, on the part of the appellant, that there are various most satisfactory reasons why this claim against the estate of Mr. Boardman cannot be maintained, even if the original right to these dividends, under this marriage settlement, be conceded to Mrs. Boardman.

Mr. Boardman was permitted to receive these dividends during his life, with Mrs. Boardman's knowledge, and without objection or interference from her. He received and used them as his own, keeping no account with his wife in respect to them, and rendering her no account of them; and though she was aware that he was so taking and using them, she never called upon him, or the trustee, for any account of them, or expressed any dissatisfaction with the course that was being pursued, or gave any notice of an intention to claim them as

her own.   We are referred to divers highly respectable authorities, elementary writers and decided cases, by the appellant's counsel, to show that under such circumstances the law implies her assent, and that at his death this income belonged to his estate.

We deem it unnecessary to go into any examination of these authorities, for the reason that other facts, found by the committee, exert a paramount influence, and render the principles contended for inapplicable to the case before us.

The committee finds that Mrs. Boardman supposed and believed that this income belonged to her ; that she had a general impression from the tenor of the contract that these dividends were to be invested and accumulate for her benefit and form an estate for her after her husband's death ; that she never intended to relinquish her legal rights under the ante-nuptial contract, and never supposed that she had done so ; that she never in fact relinquished any of them, unless such relinquishment may be legally inferred and implied from other facts found, and from her acceptance of the provision made for her in his will.

The committee further finds that Mrs. Boardman was not much aquainted with business affairs, and had perfect faith in the good judgment and great caution of her husband ; that he was not in the habit of talking with her in relation to his business transactions or investments ; and that she, from motives of delicacy, never questioned him in relation to matters which he seemed to prefer not to make a subject of conversation.   On some occasions Mr. Boardman sent orders by his wife for the trustee to sign, saying "they are orders for your dividends."   Some three or four years after the marriage Mr. Boardman had a negotiation with a gentleman in New Haven for the purchase of a block of buildings in that city.   He informed his wife that he was about to make such a purchase with some of her dividends.   She asked where, and he informed her.   Soon after he told her that the owner refused to sell.   About the same time, in speaking of the Southern States, and the probability of their repudiating their bonds, he said to her, "Now you will be glad you have

none of those Mobile bonds." It is found that Mrs. Board-man understood these remarks, in reference to her dividends and investments, as implying that he was, in some way, investing them for her benefit.

On the shares of stock in the Delaware & Hudson Canal Company, stock dividends were made at three several times, amounting in the aggregate to one hundred and ninety-nine shares. Fifteen additional shares were also distributed on the stock held in the Bank of New York. The trustee received the certificates for these additional shares with the knowledge of Mr. Boardman. One hundred and thirty-three shares of the Delaware & Hudson stock were subject to a payment of sixty dollars per share, which was made by the bankers of Mr. Boardman, by his direction, out of funds in their hands. One hundred dollars per share was in like manner paid, and in the same way, on the fifteen shares of additional stock in the Bank of New York; the dividends previously received by Mr. Boardman, from the trust funds, in each of those institutions, being greater than the amounts so paid. In August, 1860, Mr. Boardman purchased, through his bankers, for and on account of said trust, fifty shares of stock in the Continental Bank in the city of New York. These shares were transferred to the trustee by his bankers August 27th, 1860. The dividends on said trust stocks exceeded at that time the amount of the purchase. It is expressly found that this investment was made in consequence and on account of the dividends received from said trust stocks, and as a partial investment thereof, for the use and benefit of his wife. All these shares stood in the name of the trustee, down to the 14th of February, 1870, when Mr. Boardman procured some of them to be transferred to himself by virtue of powers of attorney previously procured from the trustee.

In face of these facts it surely cannot be said that Mrs. Boardman, knowingly and intentionally, gave up her right to these dividends. There was no relinquishment, no abandonment. She was aware that her husband collected them and disposed of them, and she assented to it. There are numer-

ous cases, and of the highest authority, in which it has been held that when the wife permits her husband to receive the profits of her separate estate, they living together, and he paying all the expenses of their domestic establishment, the presumption of law is, that it was the intention of the wife to make a gift of those profits to her husband. There are many cases where in consequence of these receipts of the income of the wife's separate estate, the husband is induced to live at greater expense than he otherwise would have done; thus increasing the comforts of their home, perhaps procuring luxuries for his wife as well as for himself. To call the husband to account, after a lapse of years, for moneys thus expended, or to make a claim on his estate, after his death, in favor of the wife, would obviously be unjust. The case at bar differs widely from all such cases. Mrs. Boardman assented to the collection of the dividends on her separate estate by her husband, and to the disposition of them by him. Was her assent given to an expenditure of these dividends for her support, or for that of the family? On the contrary, it is expressly found that she supposed he was investing them for her benefit. His own declarations to her, with other facts found by the committee, clearly warranted her in entertaining such a supposition at the time; and from proofs now made, the fact is established beyond doubt or controversy, that this trust fund was increased by these dividends from time to time after the marriage, till the year before the death of Mr. Boardman. She never called for an account of these investments, and made no inquiry regarding them, during her whole married life. The reason is given by the committee. We think it creditable to them both. Living harmoniously and happily together, they found other topics of conversation more interesting than a discussion as to how they had bestowed, or how they should bestow, their increase of goods. The just demands of Mrs. Boardman are not to be impaired by her having been silent rather than clamorous; a course of conduct which, under the circumstances, we must regard as eminently praiseworthy. Nor were Mr. Boardman's expenses affected in the slightest degree by the receipt

of these dividends. His annual expenditures absorbed but a small part of his individual income.

The right of Mrs. Boardman to these dividends during her married life, as her sole and separate estate, being established, we discover, as yet, no reason why her claim against the estate is not just and valid. The liability for interest perhaps necessarily follows; it certainly does in this case, for interest was received. A few additional questions, bearing upon the main act, remain however to be considered.

On the 31st of January, 1870, Mr. Boardman procured from the trustee powers of attorney to convey one hundred and ninety nine shares of stock in the Delaware & Hudson Canal Company, the accumulation on the original two hundred shares; fifteen shares of stock in the Bank of New York, additional to the original hundred and twenty shares; and fifty shares of stock in the Continental Bank, previously purchased on account of the dividends received from said trust stocks, and as a partial investment of the same for the use and benefit of his wife. On the 14th of February, 1870, acting under these powers of attorney, Mr. Boardman caused these shares of stock in the Delaware & Hudson Canal Company and in the Continental Bank, to be transferred to himself; and on the 11th day of April, 1870, he caused the shares in the Bank of New York to be transferred to himself by virtue of the same power. And it is found that, at the time he applied for and obtained said powers of attorney, and transferred said stocks, he intended thereby to convert the same to his own use, so that neither said stocks, nor the dividends received by him upon said original trust stocks, should go to the use and benefit of his wife, but should belong to and form part of his estate. Of all these transactions, indeed of the existence of these stocks, as accumulations of, or as belonging to, the trust funds, Mrs. Boardman was wholly ignorant until after his death.

We cannot regard these acts of Mr. Boardman as materially affecting the rights of Mrs. Boardman. At the most, they amount to no more than an assertion of his rights, as he understood them, to those trust funds and accumulated

dividends ; his construction of the ante-nuptial contract. It should be borne in mind that during all his previous married life, then approaching thirteen years, he had given this contract a totally different interpretation ; had recognized and treated these dividends as she had, as hers, not as his. This late, sudden, and unexplained change of views, wrought out in secret, so far as she was concerned, cannot and should not increase any right of his or diminish any right of hers.

But the will of Mr. Boardman, made in connection with these transactions, on the 19th of March, 1870, makes provision for Mrs. Boardman, which, it is insisted, she cannot accept, as she has done, and also be entitled to the allowance of this claim.

In the first item of this will the testator says :—" The settlement I made with my dear wife, Lucy H. Boardman, before our intermarriage, in lieu of dower, is hereby confirmed ; and in addition to the provision therein made for her, I hereby give and devise to her the mansion house, grounds," &c., &c. Then follow other bequests ; then this clause:— " My intention and object was and is, to make abundant provision for the support and comfort of my dear wife, by the three preceding items, in lieu of dower, or share in my real or personal estate." He then disposes of the residue of his estate, making no other or further allusion to his wife.

While it is quite plain that by accepting the provision made for her in this will the widow is cut off from dower, we discover nothing in the entire document which bars her from presenting and enforcing any legitimate claim, by way of indebtedness, which she may have against the estate. Besides, the will confirms this marriage settlement, and directs all just claims and expenses to be paid. So far, therefore, from finding any impediment to the payment of this claim within the will itself, we should say, looking to that instrument alone, that the testator directed that it should be paid.

. Highly respectable authorities, certainly, are not wanting to show that we are not at liberty to go outside of what is technically styled the four corners of the will, in a case of this description, to get at the intention of the testator. That may

.be the safer and better rule, but, as we reach the same result in either event, we prefer not to put the case solely on that ground.

Going outside of this will, it appears that the testator did not suppose that this claim would be made against his estate; that the clauses in it relating to his widow were placed there in the belief that it would not be made. Perhaps it is no assumption under these circumstances to say that the testator then regarded the claim as invalid; that if presented it would not be allowed. Had he known that the law would have pronounced the claim good, and that his estate was responsible for it, can any one say that he would not have said to his executors, pay it? But then he would have altered his will. That is possible, but what would the alteration have been? Is any one warranted in saying that he would have made no bequest whatever to his wife? If any, how much? Taking out this claim, his estate had more than doubled during his married life. On reflection, is it certain that he would have diminished the amount given to his wife?

But it is idle to wander in this field of conjecture. That the will gives the widow the original trust fund, and certain specified amounts in addition, is agreed. Let the provisions of the will be carried out, and let this claim stand on its own merits.

But it is said that the provisions of this will, in favor of Mrs. Boardman, were made known to her, and that she expressed herself fully satisfied with them. We see nothing in that to bar this claim. She was not asked to relinquish it, and did not suppose that she had relinquished it. Nor do we think that the doctrine of election applies in this case. The amount received by the residuary legatees will, no doubt, be diminished by the payment of this claim; but we do not think that the assertion of it violates the familiar principle which forbids one, after taking a beneficial interest under a will, from setting up a right or claim which shall defeat the effect and operation of that will.

The statute of limitations presents no bar. As against the trustee no right of action has accrued. Mr. Boardman

held this money by power of attorney from the trustee, and was in the place of the trustee. He exerted no power as husband, nor as such did he attempt to exert any, prior to 1870; when, and not before, if her rights were not saved by coverture, the statute began to run.

We advise the Superior Court to make the corrections in the items of this account suggested in the report of the committee; and then to affirm the decree of the court of probate.

In this opinion the other judges concurred.